**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-6102

ZHENLI YE GON,

Petitioner – Appellant,

v.

GERALD S. HOLT, U.S. Marshal for the Western District of
Virginia; FLOYD G. AYLOR, Warden of the Central Virginia
Regional Jail,

Respondents – Appellees,

and

ERIC H. HOLDER, JR., Attorney General of the United States;
HILLARY RODHAM CLINTON, United States Secretary of State;
EDWIN D. SLOANE, United States Marshal for the District of
Columbia,

Respondents.

Appeal from the United States District Court for the Western
District of Virginia, at Roanoke.  James C. Turk, Senior
District Judge. (7:11-cv-00575-JCT)

Argued: October 29, 2014      Decided: December 16, 2014

Before SHEDD and FLOYD, Circuit Judges, and DAVIS, Senior
Circuit Judge.

Affirmed by published opinion.  Judge Shedd wrote the opinion,
in which Judge Floyd and Senior Judge Davis joined.

**ARGUED:** Gregory Stuart Smith, GREGORY S. SMITH, ATTORNEY AT LAW, Washington, D.C., for Appellant. John Alexander Romano, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** John C. Lowe, JOHN LOWE, P.C., Bethesda, Maryland, for Appellant. Leslie R. Caldwell, Assistant Attorney General, David A. O'Neil, Acting Deputy Assistant Attorney General, Valinda Jones, Senior Trial Attorney, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Timothy J. Heaphy, United States Attorney, Anthony Giorno, First Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellees.

SHEDD, Circuit Judge:

In 2008, Mexico sent a request to the United States to extradite Zhenli Ye Gon, a Mexican citizen. Ye Gon's extradition hearing was held before a magistrate judge in the District of Columbia, who determined that Ye Gon was extraditable under the Extradition Treaty Between the United States of America and the United Mexican States[1] ("Treaty"). Ye Gon then filed a habeas corpus petition challenging this determination in the Western District of Virginia, and the district court denied that petition. Ye Gon now appeals the denial, claiming that the magistrate judge lacked jurisdiction to conduct the extradition proceeding and that the Treaty bars his extradition. We affirm.

I.

We begin by reviewing the mechanics of the extradition process generally, as well as the specific requirements imposed by this Treaty. The process of extraditing a non-United States citizen to a foreign nation is conducted largely by the United States Department of State, which receives any requests for extradition from foreign nations and determines whether those requests are governed by a treaty. Mironescu v. Costner, 480 F.3d 664, 665 (4th Cir. 2007). If the State Department

_____

[1] U.S.-Mex., May 4, 1978, 31 U.S.T. 5059.

3

determines that there is an applicable treaty, it refers the matter to the Justice Department, which in turn reviews the request under the applicable treaty. If the Justice Department deems the request valid, it then refers the matter to the United States Attorney for the district in which the fugitive is believed to be located. Id.

The United States Attorney then files a complaint before a federal justice, judge, or magistrate, seeking a warrant for the fugitive's arrest and a certification that he may be extradited. 18 U.S.C. § 3184. Because the extradition statute provides that this judge may "charg[e] any person found within his jurisdiction" with having committed a foreign crime, id., only judicial officers with jurisdiction over the place where the fugitive is "found" may conduct these extradition proceedings. See Pettit v. Walshe, 194 U.S. 205, 218-19 (1904).

Once the extradition judge has issued the extradition warrant and the fugitive has been apprehended, he is brought before that judge for an extradition hearing. 18 U.S.C. § 3184. The extradition hearing is not a full trial; rather, its purpose is to determine (1) whether there is probable cause to believe that there has been a violation of the laws of the foreign country requesting extradition, (2) whether such conduct would have been criminal if committed in the United States, and (3) whether the fugitive is the person sought by the foreign country

4

for violating its laws. Peroff v. Hylton, 542 F.2d 1247, 1249 (4th Cir. 1976). If the extradition judge determines that the fugitive is extraditable, he must send his certification of extraditability to the Secretary of State, who has the final executive authority to determine whether to extradite the fugitive. 18 U.S.C. §§ 3184, 3186; Plaster v. United States, 720 F.2d 340, 354 (4th Cir. 1983) ("Within the parameters established by the Constitution, the ultimate decision to extradite is, as has frequently been noted, reserved to the Executive as among its powers to conduct foreign affairs.").

The extradition judge who conducts the hearing does not do so in his capacity as a judicial officer of the United States. In re Kaine, 55 U.S. 103, 120 (1852). The issuance of a certification of extraditability is therefore not a final order within the meaning of 28 U.S.C. § 1291. As a result, and because § 3184 does not provide for direct review of extradition decisions, a fugitive's only avenue to challenge the decision is to file a petition for habeas corpus review under 28 U.S.C. § 2241. See Haxhiaj v. Hackman, 528 F.3d 282, 285-86 (4th Cir. 2008); Ordinola v. Hackman, 478 F.3d 588, 598 (4th Cir. 2007). Habeas corpus review of an extradition case is limited to determining whether the extradition judge had jurisdiction, whether the charged offense is an extraditable offense under the applicable treaty, and whether there is any evidence warranting

5

the conclusion that probable cause exists for the violation of the foreign country's laws. Ordinola, 478 F.3d at 598. It is the State Department's practice to suspend all action on an extradition request once it becomes aware that the fugitive has filed a petition for habeas corpus review. Department of State, 7 Foreign Affairs Manual 1634.3(f), "Judicial Review of a Finding of Extraditability" (2005).

The Treaty in this case obligates Mexico and the United States to extradite persons whom the authorities of the country requesting extradition have charged with committing an offense within that country's territory. Treaty art. 1. The country requesting the return of such a person is termed the "requesting country," and the country asked to return such a person is called the "requested country." This mutual obligation to extradite is, however, subject to certain limitations. Those relevant to this case are outlined below.

Article 6 of the Treaty, entitled "Non bis in idem,"[2] is analogous to our constitutional prohibition on double jeopardy. In essence, it prevents a fugitive from being tried for the same offense in two different countries. The provision states that the requested country shall not extradite a fugitive who "has

---

[2] In English, this phrase means "not twice for the same thing." Black's Law Dictionary 1150 (9th ed. 2009).

been prosecuted or has been tried and convicted or acquitted" in that country, if that prosecution or trial was "for the offense for which extradition is requested."

The Treaty also restricts the offenses for which a fugitive may be extradited to those that are criminal in both the United States and Mexico. This limitation is known as "dual criminality," and it "ensures that the charged conduct is considered criminal and punishable as a felony in both the country requesting the suspect and the country surrendering the suspect." Ordinola, 478 F.3d at 594 n.7. The Treaty's version of the dual criminality requirement is set forth in Article 2, which states that "[e]xtradition shall take place...for wilful acts which...are punishable in accordance with the laws of both Contracting Parties."

Finally, the Treaty codifies a customary principle of international relations in Article 17, titled "Rule of Specialty." The rule of specialty is premised on a "norm of international comity." United States v. Day, 700 F.3d 713, 722 (4th Cir. 2012). The Supreme Court has recognized for more than a century that it is generally accepted that extradited persons, once returned to the requesting country, may be tried only for those offenses for which extradition was granted by the requested country. See United States v. Rauscher, 119 U.S. 407, 416-17 (1886). The Treaty makes this rule explicit, stating that

7

"[a] person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted." Treaty art. 17.

## II.

Having described the legal landscape in which this appeal arises, we now turn to the facts. Zhenli Ye Gon, a citizen of Mexico, owned and operated pharmaceutical businesses in and around Mexico City, including Unimed Pharm Chem. Beginning in 2003, Unimed legally imported psychotropic substances, including pseudoephedrine, into Mexico, until the Mexican authorities revoked Unimed's authorization to import or manufacture such substances in July 2005. Despite this loss of permission, Ye Gon continued to import these substances, and in October 2005 began construction of a new Unimed pseudoephedrine manufacturing plant in Toluca, Mexico. Once the plant was operational, it manufactured over 600 kilograms a day of a white crystalline powder, which was later tested and found to contain ephedrine, pseudoephedrine, methamphetamine acetate, and other psychotropic substances under Mexican law.

Believing that he was engaged in the large-scale manufacture and distribution of methamphetamine, a Mexican court issued a warrant for Ye Gon's arrest in June 2007. The next

8

month, the United States government filed a criminal complaint against Ye Gon in the United States District Court for the District of Columbia, charging him with illegally importing drugs into the United States. He was arrested in Maryland on this charge in July 2007 and was transferred to the custody of the United States Marshal in the District of Columbia. The government filed a superseding indictment against Ye Gon in November 2007, charging him with conspiring to aid and abet the manufacture of 500 grams or more of methamphetamine, knowing that it was to be imported into the United States, in violation of 21 U.S.C. §§ 959, 960, and 963, and 18 U.S.C. § 2.

In June 2008, pursuant to the Treaty, Mexico requested Ye Gon's extradition from the United States to face prosecution on charges of organized crime; unlawful firearm possession; money laundering; diversion of essential chemicals; and drug importation, transportation, manufacturing and possession. The government filed an extradition complaint in the District Court for the District of Columbia in September 2008. In June 2009, approximately four months before Ye Gon's criminal trial was scheduled to begin, the government moved to dismiss the charges against Ye Gon to allow for his extradition and trial in Mexico. The government's stated reasons for requesting this dismissal included Mexico's significant and separate interests in prosecuting the case, the fact that the conduct charged occurred

9

largely within Mexico, and the fact that much of the evidence and witnesses that the government would rely on in prosecuting the case were located in Mexico. The government also stated that it had concerns about the strength of its evidence in light of recent recantations by key witnesses. In August 2009, with the government's consent, the district court dismissed the criminal charge against Ye Gon with prejudice.

Ye Gon's extradition hearing was then held before a federal magistrate judge in the District of Columbia beginning in September 2008. After extensive proceedings, including a multi-day evidentiary hearing, the magistrate judge issued a certification of extraditability. In re Zhenley Ye Gon, 768 F. Supp. 2d 69 (D.D.C. 2011). Two days later, Ye Gon filed a petition for a writ of habeas corpus in the Western District of Virginia, where he was then being held. Ultimately, the district court denied the petition. Zhenli Ye Gon v. Holder, 985 F. Supp. 2d 733 (W.D. Va. 2013).

In this appeal from the denial of his habeas petition, Ye Gon raises four claims: (1) the D.C. magistrate judge did not have jurisdiction to issue his certification of extraditability because Ye Gon was not "found within" the District of Columbia for purposes of 18 U.S.C. § 3184; (2) the Non Bis In Idem clause of the Treaty prevents his extradition on the Mexican charges because his United States conspiracy charge has been dismissed

10

with prejudice; (3) the Treaty's dual criminality requirement prevents his extradition because the Mexican crimes with which he is charged are not also criminal in the United States; and (4) the Treaty's rule of specialty provision requires this court to limit the charges on which he can be tried in Mexico to those authorized by the extradition magistrate. For the reasons that follow, we find that none of these claims merits relief and affirm the district court's denial of the habeas petition.

III.

Ye Gon first claims that the magistrate judge who conducted his extradition proceedings lacked jurisdiction over him under 18 U.S.C. § 3184. He contends that he was not "found within [the] jurisdiction" of the D.C. magistrate because he was arrested on criminal charges in Maryland and was then transported to the District of Columbia against his will.

Although we have reviewed many extradition proceedings conducted under Section 3184, we have never elaborated on its jurisdictional requirements. Only one of our decisions, Atuar v. United States, 156 Fed. Appx. 555 (4th Cir. 2005) (unpublished), has mentioned even in passing the issue of jurisdiction under § 3184. There, we agreed with the parties' stipulation that the extradition judge, a West Virginia magistrate, had jurisdiction to conduct a § 3184 hearing because "at the time the petition

11

was formally filed against [the suspect], he was incarcerated in ... West Virginia." Id. at 559 n.5.

The most logical reading of the text of § 3184 supports the view that the fugitive's location at the time extradition proceedings are brought against him determines where he is "found." The statute states that the extradition judge may charge a person "found within his jurisdiction" with having committed a crime in a foreign country in violation of an extradition treaty. The jurisdictional requirement is thus textually linked to the extradition charge. The most natural reading is that the two are temporally linked as well – that is, jurisdiction must be satisfied at the time that the fugitive is charged with having committed an extraditable offense. Section 3184, therefore, apparently requires that a fugitive's extradition hearing be held before a judge with jurisdiction over the place where he was found as a fugitive.

Binding authority on this point is limited to Pettit v. Walshe, 194 U.S. 205 (1904). In Pettit, an immigration commissioner in New York issued an extradition warrant for Walshe, a British citizen, and ordered Walshe to be brought to New York to appear before him. Walshe was arrested in Indiana and transported to New York for his extradition hearing. The Supreme Court held, under the terms of the treaty between the United States and Great Britain and a predecessor of § 3184,

12

that the commissioner could not order Walshe to appear in New York; rather, the extradition hearing could properly have been held only in Indiana because "the evidence of the criminality of the charge must be heard and considered by some judge or magistrate ... sitting in the state where the accused was found and arrested." Id. at 218-19.

The arrest at issue in Pettit was made pursuant to an extradition warrant. Here, by contrast, the warrant upon which Ye Gon was arrested in Maryland was for a United States criminal charge. No extradition complaint was filed against Ye Gon until September 2008, when Ye Gon was already in federal custody in the District of Columbia. We read Pettit, consistent with our reading of the statute's text and with our unpublished decision in Atuar, to establish only that a defendant must be tried in the same location where his extradition warrant is executed – in Ye Gon's case, in the District of Columbia. Pettit thus provides no support for Ye Gon's argument that the location of his arrest on the drug conspiracy charge is relevant under Section 3184.

Ye Gon argues that the fact that he was moved from Maryland to the District of Columbia against his will precludes the D.C. magistrate from exercising jurisdiction over him. We find no merit in this argument. Under the Ker-Frisbie doctrine, a defendant's involuntary presence in a court is not a bar to personal jurisdiction. See Frisbie v. Collins, 342 U.S. 519, 511

13

(1952) ("This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'"); United States v. Shibin, 722 F.3d 233, 243 (4th Cir. 2013) (holding, in an extradition case, that "[u]nder the Ker-Frisbie doctrine, the manner in which the defendant is captured and brought to court is generally irrelevant to the court's personal jurisdiction over him.").[3]

Further, when construing other jurisdiction and venue statutes concerning foreign nationals that, like § 3184, require a defendant to be "found in" a place, we have held that this "found in" requirement is satisfied even when the defendant is brought there against his will. For example, in Shibin, we held that a defendant was "found" in the United States and could be tried here on piracy charges, despite being forcibly removed to the United States from Somalia. 722 F.3d at 244. Likewise, in

_____

[3] Ye Gon also argues that he cannot be tried in the District of Columbia because Maryland is, in the words of Wright v. Henkel, 190 U.S. 40, 58 (1903), "the place where [he] was found and, in legal effect, the asylum to which he had fled." His reliance on this language is misleading because it was written to explain why state laws, in addition to federal laws, should be examined for purposes of analyzing dual criminality. Ye Gon's use of this phrase to support his personal jurisdiction argument thus takes it out of context and ignores the case's holding, which was that Wright could be detained pending his extradition.

14

United States v. Uribe-Rios, 558 F.3d 347, 356-57 (4th Cir. 2009), we held that a defendant facing deportation was "found in" and could be tried in the Western District of North Carolina, although he was transferred there after being first detained by immigration authorities in the Eastern District of North Carolina. Accordingly, the D.C. magistrate judge properly exercised personal jurisdiction over Ye Gon under 18 U.S.C. § 3184.

IV.

Ye Gon next argues that the Treaty's Non Bis In Idem provision in Article 6 bars his extradition. As noted, Ye Gon was charged in the United States with criminal conspiracy to aid and abet the manufacture of methamphetamine. He contends that, because this charge was later dismissed with prejudice, he has been prosecuted and acquitted of it. As a result, he argues, he cannot be prosecuted again on the Mexican charges because each Mexican charge arose out of the same acts or transactions underlying the American conspiracy charge.

To succeed on this argument, Ye Gon must show both that he "has been prosecuted or has been tried and convicted" of the American offense, and that the American offense is "the offense for which extradition is requested" by Mexico. We need not decide whether the D.C. district court's dismissal of Ye Gon's

15

conspiracy charge with prejudice satisfies the requirement that he "has been prosecuted or has been tried and convicted or acquitted" by the United States, because we find that the American conspiracy proceedings were not "for the offense[s]" for which Mexico has requested extradition.

We have never established a framework for examining, under a Non Bis In Idem clause, whether an American offense is "the offense" for which the requesting country seeks extradition. The parties now offer competing frameworks. The government urges us to adopt the familiar test from <u>Blockburger v. United States</u>, 284 U.S. 299 (1932), under which we would ask whether the American and Mexican offenses each contain an element that the other does not. Ye Gon, however, urges us to follow the decision in <u>Sindona v. Grant</u>, 619 F.2d 167, 178 (2d Cir. 1980), under which we would compare the conduct underlying the American and Mexican offenses to determine whether both arise out of a "single criminal act, occurrence, episode or transaction" (internal citation omitted).

We begin our analysis with the language of the Treaty. Article 6 directs the parties to examine "the <u>offense</u> for which extradition is requested," while the dual criminality provision in Article 2 prevents extradition for crimes unless they are "wilful <u>acts</u> ... punishable in accordance with the laws of both Contracting Parties" (emphasis added). The use of the word

16

"offense" in this context and "acts" in another signifies that the "offenses" to be compared during the Non Bis In Idem inquiry must be something other than the acts underlying those offenses. The most natural reading of "offense," as distinct from "acts," is that "offense" refers to the definition of the crime itself. This weighs heavily in favor of the government's elements-based Blockburger approach.

Moreover, the State Department has interpreted similar "offense"-based Non Bis In Idem provisions in other treaties to call for a Blockburger analysis. Many of these treaties were signed within a few years of 1978, when the Treaty at issue in this case was signed. See, e.g., Extradition Treaty with the Philippines, S. Exec. Rep. No. 104-29, at 10-11 (1996) (Non Bis In Idem clause applies only where the crimes in both countries are "exactly the same"; "[i]t is not enough that the same facts were involved"); Extradition Treaty with Thailand, S. Exec. Rep. No. 98-29, at 4 (1984) ("offense"-based Non Bis In Idem clause was drafted narrowly to ensure that the person extradited can be tried in two countries for two different offenses, even when "the acts are the same"); Extradition Treaty with Costa Rica, S. Exec. Rep. No. 98-30, at 5 (1984) (prosecution in a second country would be permissible for "different offenses ... arising out of the same basic transaction"). See also Elcock v. United States, 80 F. Supp. 2d 70, 83 (E.D.N.Y. 2000) ("[T]he Department

17

of State has clearly expressed its view that "offense"—based double jeopardy provisions ... apply only where the elements of the crimes charged in the domestic prosecution and the extradition request are the same, regardless of whether the underlying facts are the same.") Such State Department treaty interpretations are entitled to "substantial deference" from the courts. United States v. Al-Hamdi, 356 F.3d 564, 571 (4th Cir. 2004).

Turning now to Ye Gon's proposed framework, we do not find persuasive the reasoning of the Second Circuit in adopting the "same conduct" test. In Sindona, the State Department initiated an extradition proceeding against an Italian businessman for the Italian crime of fraudulent bankruptcy. Before he was extradited, however, he was indicted in the United States on charges of fraudulent conduct that led to a bank collapse. The Second Circuit examined whether the American charges precluded Sindona's extradition under the treaty between the United States and Italy, which prevented extradition if the fugitive had been tried or proceeded against in the United States "for the offense for which his extradition is requested," 619 F.2d at 176, language almost identical to the Non Bis In Idem clause at issue in this case.

In analyzing whether the Italian and American crimes qualified as the same "offense" under this clause, the Second

18

Circuit rejected the Blockburger test, reasoning that foreign countries could not be expected to be aware of its existence. Instead, the court held that the construction of the Non Bis In Idem clause should be "at least as broad" as two other interpretations of double jeopardy. The first of these was Justice Brennan's concurring opinion in Ashe v. Swenson, 397 U.S. 436 (1970), in which he wrote that any charges arising out of a "single criminal act, occurrence, episode or transaction" on which a criminal trial had already been held should be barred by the Double Jeopardy Clause. Id. at 453-54. The second was the Justice Department's internal Petite policy, named for Petite v. United States, 361 U.S. 529 (1960), which stated that federal prosecutors should not try defendants "for substantially the same act or acts" that have already been tried in a state prosecution. Sindona, 619 F.2d at 178-79 (internal citations omitted). Thus, the Second Circuit appeared to adopt a "same conduct" test for determining whether two countries' offenses are equivalent under a Non Bis In Idem clause.

In the years since Sindona was decided, one of the two foundations for this "same conduct" test has been eroded by later Supreme Court rulings. In United States v. Dixon, 509 U.S. 688, 704 (1993), the Court struck down the "same conduct" rule for double jeopardy analysis as "wholly inconsistent with earlier Supreme Court precedent and with the clear common-law

19

understanding of double jeopardy." In doing so, the Court definitively rejected Justice Brennan's interpretation of the Double Jeopardy Clause as expressed in his concurring opinion in Ashe v. Swenson. Sindona's other foundation, an internal Justice Department policy, self-evidently carries no legal authority. Cf. United States v. Jackson, 327 F.3d 273, 295 (4th Cir. 2003) ("[I]t is well established that the Petite policy and other internal prosecutorial protocols do not vest defendants with any personal rights."); United States v. Musgrove, 581 F.2d 406, 407 (4th Cir. 1978) ("[A] defendant has no right to have an otherwise valid conviction vacated because government attorneys fail to comply with departmental policy on dual prosecutions.").

In addition to its shaky legal foundations, we believe that the Sindona "same conduct" rule proves inadequate upon application, as illustrated in the Sindona decision itself. Immediately after it purported to adopt the "same conduct" test, the Second Circuit concluded that the Italian charge of fraudulent bankruptcy and the American charges of fraudulent conduct did not in fact constitute the same "offense" under the treaty's Non Bis In Idem clause. The court reasoned that, although the Italian crime may have been the "but-for cause" of the American crimes, the harms to the two countries were distinct, and the crimes charged by the American prosecutors were "on the periphery" of the Italian crimes. Thus, after

20

endorsing the "same conduct" test in principle, the court then considered additional factors during its application, effectively acknowledging that the "same conduct" test did not satisfactorily resolve the Non Bis In Idem inquiry.

For these reasons, we decline to follow Sindona's "same conduct" framework, and adopt the Blockburger "same elements" test as the proper mode of analysis in this context. Ye Gon does not contest that under a Blockburger analysis, the Mexican offenses of organized crime, unlawful firearm possession, money laundering, diversion of essential chemicals, and drug importation, transportation, manufacturing and possession do not constitute the same "offense" as the American charge of conspiracy to aid and abet the manufacture of methamphetamine. We therefore hold that Article 6 of the Treaty does not bar Ye Gon's extradition.

V.

Ye Gon next argues that the offenses for which Mexico requests his extradition do not also constitute criminal acts in the United States, and therefore the Treaty's dual criminality provision in Article 2 bars his extradition. In Collins v. Loisel, 259 U.S. 309, 312 (1922), the Supreme Court held that dual criminality is satisfied "if the particular act charged is criminal in both jurisdictions," even if the name of the offense

21

or the scope of the liability was different in the two countries. This language has been broadly accepted as establishing that dual criminality requires only that the offenses in the two countries punish the same basic evil; it does not require that the offenses contain identical elements. See, e.g., Clarey v. Gregg, 138 F.3d 764, 766 (9th Cir. 1998); Peters v. Egnor, 888 F.2d 713, 719 (10th Cir. 1989); Shapiro v. Ferrandina, 478 F.2d 894, 907-08 (2d Cir. 1973).

Ye Gon concedes that to satisfy dual criminality under Collins, the elements of the two countries' crimes need not be exactly the same. Rather, he argues that the acts alleged in the Mexican charging documents must be sufficient, standing alone, to support United States criminal charges. He rests this argument on language from Collins stating that the "particular act charged" must be criminal in both jurisdictions. 259 U.S. at 312 (emphasis added).

We disagree with Ye Gon's narrow reading of Collins. In our view, it is permissible to examine conduct outside that alleged in the requesting country's charging documents in the course of conducting a dual criminality analysis. The elements of Mexican crimes differ from the elements of American crimes, and Mexico thus has no reason to plead in its own charging documents all facts necessary to make out an American criminal charge. Ye Gon's reading therefore essentially reduces to the

22

"same elements test," which he admits was rejected in Collins. The language that Ye Gon cites from Collins is not to the contrary, because Collins did not address the question of the scope of the conduct that may be considered in conducting a dual criminality analysis.

At least two other circuits have implicitly agreed with our broader framework by actually considering conduct outside that alleged in the requesting country's charging documents when performing a dual criminality analysis. See Clarey, 138 F.3d at 766 (9th Cir. 1998) (relying on the American district court's factual findings to establish that petitioner's conduct in Mexico satisfied the American felony murder statute); Lo Duca v. United States, 93 F.3d 1100, 1112 (2d Cir. 1996) (relying on evidence presented at petitioner's Italian trial to establish that his conduct satisfied American criminal statutes).[4]

Having thus established the proper framework, we now examine whether the offenses for which Mexico requests Ye Gon's extradition satisfy the Treaty's dual criminality requirement.

---

[4] Ye Gon also quotes language from Mironescu, 480 F.3d at 668, in support of his position. However, that case did not address any dual criminality issues; it concerned whether the district court had jurisdiction to consider the habeas petition of a fugitive whom the State Department had certified for extradition. Ye Gon's reliance on Mironescu on this point is therefore inapposite.

23

Taking into consideration all of Ye Gon's alleged conduct, we conclude that each offense is also criminal under United States law.

1. Drug Offenses

Ye Gon claims that the Mexican charges against him for importing, manufacturing, transporting and possessing psychotropic substances do not represent criminal offenses under American law because he imported only the precursors to psychotropic substances, which are not controlled substances in the United States. However, under 21 U.S.C. §§ 843(a)(6)-(7), importing, manufacturing, transporting and possessing such precursors is criminal if the defendant engages in such activity "knowing, intending, or having reasonable cause to believe" that such chemicals will be used to make controlled substances or listed chemicals. The extradition magistrate found that Ye Gon falsely certified the content and origin of import shipments containing precursors to pseudoephedrine, a "list I chemical" under 21 U.S.C. § 802(34)(K) and 21 C.F.R. § 1310.02(a)(11); that he built a plant capable of manufacturing pseudoephedrine and other psychotropic substances, despite lacking the Mexican permit necessary to do so; that workers in this plant produced over 600 kilograms a day of a "white crystalline powder," and the analyzed samples of this powder contained pseudoephedrine and other psychotropic substances; that despite such production,

24

Ye Gon reported no income for the plant or for Unimed during this time period; that either Ye Gon or his driver transported the powder away from the plant; and that Ye Gon was found to have powdered pseudoephedrine hydrochloride, a salt of pseudoephedrine, in his office ten months after the company was supposed to have sold off all legally acquired inventory of that substance. These findings are sufficient to give rise to the inference that Ye Gon knew that the chemicals he imported, transported, manufactured, and possessed would be used to produce psychotropic substances. Therefore, these Mexican drug offenses are also crimes under the laws of the United States.

## 2. Diversion of Sulfuric Acid

Ye Gon claims that the Mexican offense of diverting essential chemicals – in this case, sulfuric acid – to produce narcotics is not a criminal offense in the United States because sulfuric acid is an extremely common, unregulated solvent in America. However, sulfuric acid is a "list II chemical" under 21 U.S.C. § 802(35) and 21 C.F.R. § 1310.02(b)(9), triggering certain reporting and registration requirements under 21 C.F.R. §§ 1310, 1313.

In addition, the Mexican arrest warrant charged Ye Gon with "the use of essential chemical products (sulfuric acid) to produce narcotics," including pseudoephedrine. This charge brings Ye Gon's possession of sulfuric acid within 21 U.S.C. §

25

843(a)(6)-(7)'s prohibition on possessing any chemical that may be used to manufacture a controlled substance if the person does so "knowing, intending, or having reasonable cause to believe" that the chemical will be used to manufacture such a substance. Thus, Ye Gon's Mexican charge of diverting sulfuric acid to produce psychotropic substances is also criminal in the United States.

### 3. Money Laundering

Ye Gon argues that his Mexican money laundering charge has no equivalent under United States criminal law because the Mexican arrest warrant alleged only that Ye Gon "maintained funds in Mexican territory with the knowledge that the funds had an illegal source," while the American money laundering statute, 18 U.S.C. § 1956(a)(1), requires not only proof of maintenance of funds but also of a financial transaction. As discussed above, however, our dual criminality analysis is not limited to the allegations contained in the Mexican arrest warrant or other charging documents. The Mexican prosecutor did cite financial transactions, such as Ye Gon's payment of gambling debts and currency exchange transfers, in his sworn affidavit in support of Mexico's extradition request. This alleged conduct satisfies 18 U.S.C. § 1956(a)(1)'s financial transaction requirement, and therefore, the money laundering with which Ye Gon was charged in Mexico is also criminal in the United States.

26

4. Organized Crime

Ye Gon's sole objection to the American criminality of his Mexican organized crime charges is that the goals of the alleged criminal organization – namely, drug activity and money laundering – are not criminal under United States law. Because, as discussed above, the Mexican drug charges and money laundering charges do satisfy dual criminality under United States law, that contention lacks merit. Therefore, the Mexican organized crime charges also satisfy dual criminality because they punish acts also punishable under 18 U.S.C. §§ 371, 1956(h) and 21 U.S.C. §§ 846, 848.

5. Possession of Firearms

Finally, Ye Gon argues that the Mexican charge of possessing firearms reserved for use by the armed forces is not a criminal offense under American law – and, in fact, cannot be criminalized because of the Second Amendment. This argument fails because, again, the conduct underlying this charge is criminal in the United States. All but one of the firearms that Ye Gon is charged with possessing were found in a concealed room next to his bedroom in his Mexican residence, which also contained hundreds of millions of dollars in cash in multiple currencies, the alleged proceeds of Ye Gon's illegal drug activity. Because the firearms' proximity to drug proceeds is a factor indicating that they were used in furtherance of drug

27

trafficking, see United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002), the fact that Ye Gon possessed the firearms in that room is sufficient to charge him under 18 U.S.C. § 924(c) with firearm possession in furtherance of a drug trafficking crime.[5] The only other firearm that Ye Gon is charged with possessing had an obliterated serial number, and its possession is thus criminal under 18 U.S.C. § 922(k).[6]

## VI.

Finally, Ye Gon argues that, if we do authorize his extradition, under the Treaty's rule of specialty provision in Article 17, we must limit the crimes with which Mexico may charge him to those for which the State Department will have granted extradition. Ye Gon notes that, in the years since Mexico first requested his extradition in 2008, it has filed additional charges against him, including tax evasion and

---

[5] We note that Ye Gon's constitutional argument on this point is limited to the assertion that possessing firearms "reserved for the use of the military" cannot be a crime under our Second Amendment. We do not reach this question because, as noted above, considering all of Ye Gon's alleged actions, his firearm possession is criminal under 18 U.S.C. § 924(c). Ye Gon does not challenge the constitutionality of that statute.

[6] Again, because Ye Gon does not appear to challenge the constitutionality of 18 U.S.C. § 922(k), we do not rule on that question here.

smuggling charges. Importantly, Mexico has not requested the United States to extradite Ye Gon on these additional charges.

We decline to rule on this final claim for at least two reasons. First, Ye Gon lacks standing to assert this claim.[7] The rule of specialty is a privilege of the asylum state, which it may assert or waive as it so chooses; it is not a substantive right under the Treaty accruing to Ye Gon. See Shapiro, 478 F.2d at 906 ("As a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused."); United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir. 1986) ("[Rule of specialty] protection exists only to the extent that the surrendering country wishes. ... The extradited party may be tried for a crime other than that for which he was surrendered if the asylum country

---

[7] We recognize that there may be other situations in which a defendant who has been extradited to the United States from a foreign country seeks to raise a specialty claim to prevent being charged with additional crimes in our courts. Whether such a defendant has standing to "raise whatever objections the extraditing country would have been entitled to raise" is an issue on which the circuits are split, Day, 700 F.3d at 721, and we do not resolve that issue in this circuit today. Our holding on the rule of specialty in this case is limited to the situation in which a fugitive who has not yet been extradited petitions an American court to limit the charges on which he may be tried once returned to the requesting country.

29

consents.") (internal citations omitted) (emphasis in original).[8] Therefore, because Ye Gon has no protected legal interest under Article 17 of the Treaty, he lacks standing to assert this claim. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (standing requires that "the plaintiff must have suffered ... an invasion of a legally protected interest") (internal citations omitted).

Second, even if Ye Gon did have standing to assert this specialty claim, it is not yet ripe. Despite our ruling in this case that the extradition magistrate properly issued a certification of extraditability, the final decision whether to extradite Ye Gon, and on what charges, rests not with us but with the State Department. See 18 U.S.C. § 3186; Ordinola, 478 F.3d at 597. As a result, Ye Gon may yet never return to Mexico. Further, even if the State Department does extradite him, it may elect to waive the rule of specialty in his case, permitting Mexico to prosecute him on the additional crimes. See, e.g., Najohn, 785 F.2d at 1422. Finally, even if Ye Gon is extradited, and the State Department does not waive the rule of specialty, we decline to assume that Mexico will violate its Treaty

---

[8] Ye Gon cites Day, 700 F.3d at 721, in support of his argument. Our reasoning in that case does not help him because there, we assumed without deciding that the extradited party had standing to assert a rule of specialty argument. Further, we denied the specialty claim on the merits.

obligations by trying, detaining, or punishing Ye Gon on the additional charges. Cf. Kelly v. Griffin, 241 U.S. 6, 15 (1916) ("We assume, of course, that the government in Canada will respect the convention between the United States and Great Britain, and will not try the appellant upon other charges than those upon which the extradition is allowed."); Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971) (court was "not at liberty to speculate" that Peru would not honor its obligations under the rule of specialty). As a result, we will not rule on Ye Gon's specialty claim because the predicate facts are still hypothetical. See Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

## VII.

Based on the foregoing, we affirm the denial of Ye Gon's petition for a writ of habeas corpus.

AFFIRMED

31