PILLARD, Circuit Judge,
concurring in part and concurring in the judgment:
I am in accord with much of Judge Wilkins’ fine opinion. I agree that we have jurisdiction to review the Article 5 claim, and that the treaty codifies an offense-based rather than fact-based prior-prosecution test.
I cannot endorse the degree of deference that the majority accords Belgium’s conclusion that the U.S. indictment did not charge Trabelsi with any of the same offenses for which he had already been prosecuted and punished. Under the banner of deference, the majority forgoes application of the only offense-based test any party has credibly suggested — the “same-elements” analysis associated with Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). See United States v. Dixon, 509 U.S. 688, 696,113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (Blockburger “inquires whether each offense contains an element not contained in the other.”). This deferential approach treats the Belgian proceedings as a black box, when a closer look underscores the appropriateness of the majority’s acknowledged duty to assure that the requested state applied the “correct legal standard.” Maj. Op. 1189. (The majority also acknowledges that it would have cause to inquire further if confronted with a showing of “misconduct on the part of the United States in procuring an extradition” or “the absence of review of the extradition request” by the requested state. Id. at 1189.)
Recognizing that we do not review the question de novo but accord deference to the due consideration and reasonable conclusions of the Belgian authorities, I would not employ quite so fully deferential an approach. It is our duty to look through the underlying proceedings to confirm that the correct legal standard — presumptively, Blockburger — was reasonably applied. We otherwise risk acceding even when a treaty partner, in all good faith, correctly states but misapplies a treaty’s legal test and invites successive prosecution for the same offenses in violation of a treaty’s guaran *1194 tee. Because my review of the record reveals no such error, but persuades me that Belgium made a reasoned decision that the proposed U.S. prosecution satisfies the offense-based test of Article 5, I, too, would affirm.
I.
My colleagues believe that maintaining comity with our treaty partner requires us to defer to Belgium’s application of Article 5.1, too, defer to the Belgian decision, and explain below why I therefore vote to affirm. But, for at least five reasons, I disagree with the majority’s resort to a form of deference that does not even confirm that the requisite analysis was reasonably performed.
First, we cannot unquestioningly accept Belgium’s application of Article 5 because we have a constitutional obligation to interpret and apply treaties as the law of the land, and, as the majority acknowledges, the meaning of Article 5 is fully susceptible of judicial analysis. Id. at 1186-87. It is our duty under the Supremacy Clause to apply treaty law just as we are bound to apply a federal statute or the Constitution itself. U.S. Const. Art. VI Cl. 2; see United States v. Rauscher, 119 U.S. 407, 430-31, 7 S.Ct. 234, 30 L.Ed. 425 (1886); Carlos Manuel Vázquez, Treaties As Law of the Land: The Supremacy Clause and the Judicial Enforcement of Treaties, 122 Harv. L. Rev. 599, 601-02 (2008).
Second, the majority’s deferential approach inappropriately shifts the burden of persuasion by failing even to require a court to verify that the requisite legal analysis was reasonably performed by the foreign authorities. A defendant ordinarily need only “set out a prima facie case that the second indictment charges him with the same offense for which he has already been convicted,” at which point “the burden switches to the government to demonstrate, by a preponderance of the evidence, that the two indictments charged separate offenses.” United States v. Doyle, 121 F.3d 1078, 1089 (7th Cir. 1997); see also United States v. Jones, 733 F.3d 574, 580 (5th Cir. 2013); United States v. Jurado-Rodriguez, 907 F.Supp. 568, 579-80 (E.D.N.Y. 1995) (Weinstein, J.) (remarking in the context of an extradition challenge that a treaty-based prior-prosecution bar “relates so closely to our double jeopardy concept that double jeopardy burdens of proof should apply”). The district court itself acknowledged uncertainty about whether U.S. Count IV and Belgian Charge Q actually allege distinct offenses, noting that “both underlying statutes criminalize providing support to banned organizations.” J.A. 763. Such uncertainty — which the district court resolved by deferring to the Belgian authorities — should not have been treated as discharging the burden on the government and, ultimately, the court to identify a basis for allowing Charge IV to proceed.
Third, affording heightened deference to Belgium’s application of Article 5 would be especially anomalous in this case, given our two nations’ differing domestic law on prior-prosecution bars. To the extent that I can discern, the prior-prosecution bar in Belgium’s national law appears to attach to facts and not to offenses, and it does not involve differentiation of elements. See T. Vander Beken, “Belgium, concurrent national and international criminal jurisdiction and the principle ‘ne bis in idem,’” Revue Internationale de Droit Penal, Vo. 73 (2002-2003), available at https://www. cairn.info/revue-internationale-de-droit-penal-2002-3-page-811.htm#pa3 (“As far as Belgian judgments are concerned, Belgium attaches the ne bis in idem effect to facts, not to offences.”); see generally Bas-siouni, International ExtRadition Law and PRACTICE 751 (5th ed. 2007) (“The distinction between same offense and same facts *1195 ... stems in large part from the differences in the Common Law and Civilist Systems.”). Despite that apparent difference in its domestic prior-prosecution law, Belgium agrees with the United States that this treaty codifies an offense-based approach. Nonetheless, it is unclear why we would give virtually final effect to the Belgian authorities’ application of the agreed offense-based double jeopardy test that Belgium knows as a transplant, when that approach is deeply rooted here and familiar to our courts.
Fourth, Belgium has fulfilled its interest in this case. Trabelsi is a Tunisian, not a Belgian national. The Belgian government had a powerful interest in the apprehension and prosecution of an al Qaeda operative at work within its borders. Belgium accordingly tried, convicted, sentenced and imprisoned Trabelsi to the full extent of Belgian law, and retained him until he had served his sentence there to the satisfaction of the Belgian state. By the time Belgium responded to the U.S. extradition request, the Belgian sovereign interest was at its low ebb. Far from expecting uncommon deference, Belgian authorities most likely were inclined to defer to the United States in an effort to facilitate extradition, in which event deference to Belgium is rather circular.
Fifth, the majority’s highly deferential approach is not supported by on-point or in-Circuit precedent. The majority correctly does not treat Belgium’s sign-off on the extradition as conclusive of the Article 5 question. Our review to enforce individual rights under a treaty is compatible with the comity due to a sovereign treaty partner. See generally Olympic Airways v. Husain, 540 U.S. 644, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004) (reviewing U.S. individuals’ treaty claim against Greek state airline). The majority nonetheless concludes that it must presume the correctness of Belgium’s decision. Yet the cases it cites for deference are not about prior prosecution at all, but address specialty or dual-criminality treaty provisions. Those types of provisions protect requested states’ domestic-law prerogatives, raising comity concerns not present here.
The doctrine of specialty provides that “extradited persons, once returned to the requesting country, may be tried only for those offenses for which extradition was granted by the requested country.” Zhenli Ye Gon v. Holt, 774 F.3d 207, 211 (4th Cir. 2014). The deference to extraditing countries’ decisions in specialty cases flows from the nature and function of that doctrine to prevent a requesting country from transgressing limits the requested country places on its decree granting extradition. In Johnson v, Browne, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907), for example, Canada granted the United States’ request to extradite Browne, but the extradition decree excluded the charge of conspiracy to defraud the United States. When the United States prosecuted Browne on that excluded charge, the Supreme Court disapproved the bait-and-switch, emphasizing the importance of “the highest good faith” in construing a treaty between sovereigns. Id. at 321, 27 S.Ct. 539. Canada’s decision, moreover, “was final by the express terms of the treaty itself’ and thus was not to be second-guessed by the United States. Id. at 316, 27 S.Ct. 539. In United States v. Campbell, another specialty case, the Second Circuit relied on Johnson to hold that deference was owed to Costa Rica’s determination whether charges specified in an extradition request were extraditable offenses. 300 F.3d 202, 209 (2d Cir. 2002). In view of Costa Rica’s clear decision that the offense was among those it considered extraditable, the specialty doctrine provided no traction for Campbell’s contentions to the contrary. See also United States v. Rivi *1196 ere, 924 F.2d 1289, 1301 (3d Cir, 1991); United States v. Van Cauwenberghe, 827 F.2d 424, 428 (9th Cir. 1987).
The very foundation of specialty is international comity; the same is not true of prior-prosecution bars. The specialty doctrine encourages international cooperation in the extradition system by giving assurance that, when a country gives up persons for extradition only for specified purposes or on certain conditions, those terms will not be flouted. See Van Cauwen-berghe, 827 F.2d at 428. I cannot agree that the approach of the specialty cases “is useful here” in support of the majority’s extraordinary deference in the very different context of a requested state’s permissive rather than constraining application of a treaty’s prior-prosecution bar. Maj. Op. at 1188.
The majority invokes dual-criminality cases as well in support of its rule of deference. The doctrine of dual criminality “restricts the offenses for which a fugitive may be extradited to those that are criminal in both” the requesting and requested state. Zhenli Ye Gon, 774 F.3d at 211. A dual-criminality requirement effectively gives each country a veto based on whether its domestic law criminalizes the conduct at issue. In Casey v. Department of State, 980 F.2d 1472 (D.C. Cir. 1992), for example, Casey contended his extradition on U.S. RICO and narcotics charges would violate dual criminality because RICO-style racketeering is not a crime under Costa Rican law. We dismissed his case as unripe because he was still litigating in the Costa Rican courts and had not been extradited. Two members of the court noted in the dictum on which the majority here relies that, “at a minimum, Johnson means that an American court must give great deference to the determination of a foreign court in an extradition proceeding.” Id. at 1477. Assuming we were to treat that dictum as persuasive, all it stands for is that in the dual-criminality context “a foreign court’s holding as to what that country’s criminal law provides should not lightly be second-guessed by an American court— if it is ever reviewable.” Id. (emphasis added).
Deference to a treaty partner’s understanding of its own law for that purpose in that context makes sense for reasons quite similar to those that support deference in the specialty setting: Dual criminality is effectively a two-gate obstacle, with each country the keeper of its own gate; only when both are open can the extradition proceed. See generally Restatement (Third) of Foreign Relations Law § 476(l)(c). It is an easy call that the requested country is the authority on the content of its own domestic criminal law, holding the key to the gate it uniquely guards. Cf. United States v. Garavito-Garcia, 827 F.3d 242, 246-47 (2d Cir. 2016) (deferring to Colombian Attorney General’s construction of Colombian criminal law). The reasons for deferring in dual-criminality cases to a requested country’s determination of what its own law requires do not support deference regarding correct application of the terms of the bilateral treaty itself. See generally Lozano v. Montoya Alvarez, — U.S.-, 134 S.Ct. 1224, 1232, 188 L.Ed.2d 200 (2014) (“For treaties, which are primarily compacts between independent nations, our duty is to ascertain the intent of the parties by looking to the document’s text and context.”) (citations, marks, and alterations omitted). The United States is as equipped as Belgium to understand Article 5. Casey and other dual-criminality cases cannot support a rule of deference to a treaty partner’s application of the treaty’s own prior-prosecution bar.
This case arises in a different posture and does not raise the same comity con *1197 cerns as the specialty and dual criminality precedents the majority invokes. The question here is whether the proposed prosecution will expose Trabelsi to “being tried for the same offense in two different countries.” Zhenli Ye Gon, 774 F.3d at 211. The majority’s cited specialty and dual-criminality cases involve deference to a requested state’s decision to place restrictions on an extradition rather than, as here, to authorize (but not necessarily require) the requesting state to prosecute on all specified charges. If the United States decided to dismiss certain charges — based on pri- or-prosecution concerns or otherwise — it is hard to see how that would communicate any affront to Belgium. This case simply does not raise comity concerns such as would arise if the United States contravened limitations Belgium had imposed on its decision to extradite.
I thus cannot join the majority’s reliance on what I view as an excessive degree of deference to the outcome of another country’s legal process, by which the majority effectively sidesteps its acknowledged duty to confirm that Belgium made the requisite inquiry.
II.
The record in this case confirms the value of a more searching review. For the most part, the Belgian reviewing bodies appear to have been of the view that, regardless of whether the American charges were legally distinct from the Belgian charges under a Blockburger-type analysis, the United States endeavored to prosecute Trabelsi for a factually broader terrorist conspiracy extending beyond the plot to bomb Kleine-Brogel for which he had already been convicted, and that the United States charged Trabelsi with providing material support to al Qaeda apart from the material support in Belgium for which he had already been successfully prosecuted. See, e.g., J.A. 121-22, 544-46, 611-12. Thus, had the district court not performed an independent Blockburger analysis, there might have been some doubt whether a U.S. prosecution focused on Kleine-Brogel and events in Belgium would have been authorized under the Belgians’ own understanding of how the treaty applies.
Unlike the Belgian authorities, the district court focused on whether the two prosecutions involve legally distinct offense elements, rather than offenses comprised of the same legal elements but distinguishable by the elements’ application to separate factual occurrences. The district court distinguished the three U.S. conspiracy charges on the ground that they require proof of agreement not required in the Belgian counts, whereas the Belgian prosecutions turned on proof of attempt or instigation that the U.S. charges do not require. See generally United States v. Felix, 503 U.S. 378, 389, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992) (concluding that “a substantive crime and a conspiracy to commit that crime are not the ‘same offense’ for double jeopardy purposes”). Under that analysis, even a conspiracy prosecution focused on the same conduct at issue in the Belgian case would not be barred.
The district court did not actually complete an elements-based Blockburger analysis, however, with regard to Count IV (Providing Material Support and Resources to a Foreign Terrorist Organization), despite acknowledging that it presented “a closer question” than the other three counts because “both underlying statutes criminalize providing support to banned organizations.” J.A. 763. To be sure, as the district court noted, Count IV requires proof that the organization to which the defendant provided material support is a U.S.-designated foreign terrorist organization, while Belgian Charge *1198 Q required proof that the defendant “created, assisted, or joined” an “organization of individuals whose purpose was to use force.” Id. at 388. The district court did not, however, identify any element of Charge Q that is not also required by Count IV. Id. at 763 (only identifying the element in Count IV that was not in Charge Q). The court also acknowledged that “[t]he universe of U.S.-designated foreign terrorist organizations may well be almost entirely subsumed by the universe of organizations formed for the purpose of using force.” Id. Despite that, the district court found it appropriate to defer to the Belgian courts.
Consistent with the ordinary deference owed to the legal determinations of any treaty partner, U.S. courts must at the very least satisfy ourselves that relevant offenses were compared and found to be different under the treaty’s legal standard. With respect to the first three counts of the U.S. indictment, that is and was easily done. Each is . legally distinct from the Belgian charges under the elements-based analysis the district court recounted. And each is also factually distinct from those charges to the extent that, as the Belgian courts repeatedly underscored, the United States charged Trabelsi with criminal acts encompassing but much broader than the Belgium-specific crimes entailed by the plot against Kleine-Brogel, for which he had already been convicted and punished. Blockburger is satisfied on either ground: Like the fact-based ne bis in idem approach, Blockburger permits a subsequent prosecution under an indictment listing identical legal elements so long as it charges a different set of facts. That much is obvious. A charge of a bank robbery that took place in 2015 does not bar a subsequent charge of a different bank robbery in 2016. But Blockburger additionally authorizes subsequent prosecution arising from the same conduct or transaction (the 2015 bank robbery undergirding both prosecutions) where a purely fact-based approach would not, so long as the legal elements of the subsequent charge are sufficiently distinct. See Felix, 503 U.S. at 389,112 S.Ct. 1377.
The district court’s opinion leads us up a bit of a blind alley, however, by confining itself to an elements-based analysis and then failing to demonstrate how Count IV and Charge Q each requires an element not required by the other. The opinion thus makes the Belgian and American material-support counts appear to charge the same offense. Count IV (Providing Material Support and Resources to Foreign Terrorist Organization) seems materially identical to Charge Q (“contributfing] to or [being] part of a private militia or any other organizations of individuals whose purpose is to use force”). J.A. 149; see also J.A. 388 (somewhat different translation). Neither the courts nor executive officials, whether in Belgium or in the United States, did an analysis differentiating the elements of those two offenses. As-I read the relevant statutes and the record explanations, Count IV is simply a narrower version of Belgian Charge Q. Any organization that qualifies as a foreign terrorist organization under U.S. law would also qualify as an “organization of individuals whose purpose is to use force” under Belgian law. See 8 U.S.C. §§ 1189(a)(1) (defining foreign terrorist organization); id. § 1182(a)(3)(B)(iii) (defining terrorist activity); 22 U.S.C. § 2656f(d)(2) (defining terrorism); J.A. 183 (Brussels Court of Appeals describing the prohibition on private militias as “[t]argeted in particular [at] organizations whose purpose is to use force, even if the use thereof is a means for achieving the organization’s political objectives,” and stating that “a potential organization of individuals that tries to *1199 spread radical Islam by using force would constitute an illegal private militia”).
Even if Count IV and Charge Q charged the same legal elements, however, Count IV is not barred for the more basic reason that — as the Belgians reasonably explained — at least some version of Count TV rests on factually distinct acts of material support for terrorism that were not the basis of Trabelsi’s Charge Q prosecution in Belgium. For instance, the United States alleges that, beginning in 2000, Trabelsi met with conspirators in Europe and “ma[de] preparations to travel to Afghanistan to train for jihad.” J.A. 33. Trabelsi eventually “carried cash and computers, which he had brought from Europe, to Afghanistan.” Id. at 34. And, according to the U.S. indictment, Trabelsi received training and funding from al Qaeda in Afghanistan and Pakistan. Id. at 34-35. The Belgian authorities determined that, not only had Trabelsi not been prosecuted in Belgium for that conduct, it had not even been known to them at the time. See id. at 544. A material support prosecution resting on such evidence charges a distinct offense under Article 5.
[[Image here]]
The extraordinary deference the majority adopts is unnecessary to the resolution of this case. Because the United States seeks to prosecute Trabelsi for conspiracy rather than substantive offenses in Counts I, II and II, those U.S. charges are not barred by Article 5. To the extent that the United States proves in support of Count IV different acts of material support from those that supported the Belgian prosecution, that U.S. charge is also not barred.
For these reasons, I concur in part and concur in the judgment.