# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 17, 2016   Decided January 17, 2017

No. 15-3075

UNITED STATES OF AMERICA,
APPELLEE

v.

NIZAR BEN ABDELAZIZ TRABELSI, ALSO KNOWN AS NIZAR
BEN ABDELAZIZ TRABELSI, ALSO KNOWN AS ABU QA'QA,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cr-00089-1)

*Mary Manning Petras*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief was *Elizabeth Trosman*, Assistant U.S. Attorney.

Before: ROGERS, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* PILLARD.

WILKINS, *Circuit Judge*: Nizar Trabelsi is a Tunisian national convicted in Belgium for a variety of crimes, including attempting to destroy a military base. While Trabelsi was serving his sentence for his convictions in Belgium, a grand jury in the United States indicted Trabelsi with various conspiracy and terrorism offenses. The United States requested that Belgium extradite Trabelsi. Trabelsi challenged that request in Belgium, contending that his extradition would violate the Extradition Treaty Between the United States of America and the Kingdom of Belgium (the "Extradition Treaty" or "Treaty"), Apr. 27, 1987, S. TREATY DOC. NO. 104-7, in view of the *non bis in idem* principle. Belgium disagreed and extradited Trabelsi to the United States. Trabelsi renewed his challenge here, moving the District Court to dismiss the indictment for violating the Treaty provision. In opposition, the Government argued that the District Court lacked jurisdiction to review the extradition decision. The District Court concluded that it had jurisdiction to review the decision but denied Trabelsi's motion on the merits. We conclude that we have jurisdiction to hear this appeal and review Trabelsi's extradition.

Trabelsi presents four arguments on appeal. First, he argues that the District Court erred in deferring to Belgium's decision on his double-jeopardy claim. He next contends that, absent this deference, the District Court should not have applied the test articulated in *Blockburger v. United States*, 284 U.S. 299 (1932), to compare the offenses charged in the U.S. indictment with the offenses of which he was convicted in Belgium. Even assuming that *Blockburger* applies, Trabelsi submits that the District Court erred in finding that the charges in the U.S. indictment were not the same as his

Belgian convictions. Finally, Trabelsi urges this Court to conclude that dismissal of his indictment is the appropriate remedy.

Trabelsi's arguments are unpersuasive. The scope of our review is limited, requiring deference to Belgium's decision to extradite Trabelsi. This deference creates a rebuttable presumption that Trabelsi's extradition, and Belgium's analysis in deciding to extradite him, comports with the terms of the Treaty. *See United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002). Although Trabelsi is correct that a *Blockburger* analysis is not required under the terms of the Treaty, his argument that the Treaty requires a conduct-oriented test is not supported by the text of the Treaty, which refers to "offenses." As a result, we need not reach his final two arguments, and we affirm the District Court's order denying Trabelsi's motion to dismiss the indictment.

# I.

On September 13, 2001, Trabelsi was watching television at his apartment in Ucle, Belgium when the Belgian police arrived and arrested him. While searching his apartment, the police discovered an Uzi submachine gun and a list of chemicals used to manufacture explosives. The police also searched a restaurant owned by a co-conspirator's family, and uncovered chemicals that could be used to make explosives. On September 14, 2001, Trabelsi was served with an arrest warrant, charging him with "conspiracy, destruction by explosion, possession of weapons of war, and belonging to a private militia." J.A. 96. Belgian courts convicted Trabelsi, and on September 30, 2003, he was sentenced to ten years in prison "for, among other things, having attempted to destroy the military base of Kleine-Brogel with explosives, having committed forgery, and having been the instigator of a

criminal association formed for the purpose of attacking people and property." *Id.*

On April 7, 2006, while Trabelsi was serving his sentence in Belgium, a grand jury in the United States indicted him for various offenses. A superseding indictment (hereinafter, the "indictment") was issued on November 16, 2007. The indictment charged Trabelsi with conspiracy to kill United States nationals outside of the United States in violation of 18 U.S.C. §§ 2332(b)(2) and 1111(a) (Count 1); conspiracy and attempt to use weapons of mass destruction against nationals of the United States while such nationals were outside of the United States, and against property used by the United States and a department and agency of the United States in violation of 18 U.S.C. §§ 2332a and 2 (Count 2); conspiracy to provide material support and resources to a foreign terrorist organization, specifically al Qaeda, in violation of 18 U.S.C. § 2339B (Count 3); and providing material support and resources to a foreign terrorist organization, specifically al Qaeda, in violation of 18 U.S.C. §§ 2339B and 2 (Count 4).

The United States requested that Belgium extradite Trabelsi on April 4, 2008, attaching an affidavit from the Department of Justice describing the offenses, and their elements, for which the United States sought to prosecute him. Trabelsi challenged the extradition request in Belgium, arguing that his extradition would violate certain provisions of the Extradition Treaty. Specifically, Trabelsi argued that his extradition would violate Article 5 of the Treaty, which provides that "[e]xtradition shall not be granted when the person sought has been found guilty, convicted or acquitted in the Requested State for the offense for which extradition is requested." S. TREATY DOC. NO. 104-7. On November 19, 2008, the Court Chamber of the Court of First Instance of

Nivelles held that the United States arrest warrant was enforceable, except as to the overt acts labeled numbers 23, 24, 25, and 26 in the indictment. The Court of Appeals of Brussels affirmed this decision on February 19, 2009. On June 24, 2009, the Belgian Court of Cassation affirmed the Court of Appeals.

The Belgian Minister of Justice, who has final authority over extradition requests, granted the United States' request on November 23, 2011. The Minister rejected the position that the *non bis in idem* principle is implicated by Article 5, concluding instead that the narrower offense-based "double jeopardy" principle applies. The Minister further rejected the limitation on overt acts, explaining that they were "not the offenses for which an extradition [was] requested" because "an overt act is an element (of fact, or factual), an act, a conduct or a transaction which in itself cannot automatically be qualified as an offense." Extradition Decision of the Minister of Justice, Kingdom of Belgium 11 (Nov. 23, 2011) (hereinafter "Min. Justice Dec."). By application, Trabelsi appealed the Minister's decision to the Belgian Council of State, which also concluded that the United States offenses are different and that "'overt acts' constitute elements . . . to determine whether [Trabelsi] is guilty or not guilty," and rejected his application on September 23, 2013. Council of State, Div. of Admin. Litig., Sept. 23, 2013, 29 (Belg.). Belgium extradited Trabelsi to the United States on October 3, 2013. He was arraigned the same day.

On September 15, 2014, Trabelsi moved to dismiss the indictment for violating the Extradition Treaty. He argued, *inter alia*, that his extradition violated Article 5 of the Treaty because Belgium had already tried and convicted him "for the

offense for which extradition was requested." Motion to Dismiss at 9-10 (quoting Extradition Treaty, Article 5).[1] After a hearing on September 30, 2015, the District Court denied Trabelsi's motion in an opinion and order on November 4, 2015. *United States v. Trabelsi*, Criminal Action No. 06-89 (D.D.C. Nov. 4, 2015). The District Court concluded that Trabelsi had standing to challenge his extradition, *id.* at 4-5 n.1, and that it had jurisdiction to review his extradition, *id.* at 7-11. Using the analysis articulated in *Blockburger*, 284 U.S. 299, the District Court determined that Trabelsi was not charged with the same offenses in the indictment for which he was tried and convicted in Belgium, J.A. 754-64. Trabelsi appeals, and our standard of review is *de novo*, *see McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008); *United States v. Duarte-Acero*, 208 F.3d 1282, 1284 (11th Cir. 2000).

## II.

### A.

Neither Trabelsi nor the Government challenges this Court's authority to decide Trabelsi's appeal of the denial of his motion to dismiss the indictment. However, "we have an independent obligation to consider the issue" because "there has not yet been a final judgment in the district court." *United States v. Ginyard*, 511 F.3d 203, 208 (D.C. Cir. 2008).

"In the absence of a final judgment, this court generally lacks jurisdiction to hear a challenge to a decision of a district

---

[1] Trabelsi also argued that his extradition violated Articles 15 and 6 of the Treaty, but those are not at issue in this interlocutory appeal. *See* Appellant Br. at 10.

court." *Id.* (citations omitted). However, in *Abney v. United States*, the Supreme Court held that "a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds . . . fall[s] within" the collateral order exception to the final-judgment rule. 431 U.S. 651, 659 (1977). The Court reasoned that "such orders constitute a complete, formal, and, in the trial court, final rejection of a criminal defendant's double jeopardy claim" because "[t]here are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred by the Fifth Amendment's guarantee." *Id.* "Moreover, the very nature of a double jeopardy claim is such that it is collateral to, and separable from the principal issue at the accused's impending criminal trial, i.e., whether or not the accused is guilty of the offense charged." *Id.* Such challenges do not involve the merits nor questions of evidence regarding those charges, making the order "truly collateral to the criminal prosecution itself." *Id.* at 660. Finally, the Court noted that the nature of the right is a prohibition "not against being twice punished, but against being twice put in jeopardy." *Id.* at 661 (emphasis and quotation marks omitted) (quoting *Price v. Georgia*, 398 U.S. 323, 326 (1970)). As a result, "pretrial orders rejecting claims of former jeopardy . . . constitute 'final decisions' and thus satisfy the jurisdictional prerequisites of § 1291." *Id.* at 662.

Because Trabelsi's challenge does not arise under the Double Jeopardy Clause of the Fifth Amendment, *Abney* is not precisely on point. However, the logic of *Abney* is equally applicable here. Trabelsi challenges his extradition under Article 5 of the Treaty, the prior-prosecution provision. Additionally, Trabelsi has no further procedural steps to avoid trial on the offenses alleged here, and his challenge is collateral to and separate from his guilt of those offenses. Accordingly, we hold that the District Court's order denying

his motion to dismiss the indictment fits within the collateral-order exception, and we have jurisdiction to consider Trabelsi's appeal. *See Duarte-Acero*, 208 F.3d at 1284 (applying *Abney* to a motion to dismiss an indictment based on a double-jeopardy provision included in a treaty).

**B.**

Although we have jurisdiction to hear this interlocutory appeal, the Government challenges the District Court's, and our, jurisdiction to review Trabelsi's extradition at all. In the District Court, the Government argued that Trabelsi lacked standing under the *Ker-Frisbie* Doctrine. *See Ker v. Illinois*, 119 U.S. 436, 440 (1886); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952). The Government makes no such argument here, but, again reviewing jurisdiction independently, we conclude that the *Ker-Frisbie* Doctrine does not apply because Trabelsi was extradited in accordance with a treaty. *Cf. United States v. Rauscher*, 119 U.S. 407 (1886); *Ker*, 119 U.S. at 443.

Presently, the Government contends that we lack jurisdiction to review Trabelsi's extradition because we must defer to Belgium's decision that the offenses charged in the indictment do not violate Article 5 of the Treaty. Trabelsi submits that we have jurisdiction to review his extradition and owe no deference to Belgium's decision. We hold that we have jurisdiction to review Belgium's decision, but that our review is highly deferential. Where an individual has been extradited pursuant to a treaty, we defer to the extradition decision of the extraditing country. In light of this deference, we presume, absent evidence to the contrary, that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful. *See Campbell*, 300 F.3d at 209-10.

Historically, "[e]xtradition and other forms of rendition were for the benefit of [nation] states." M. CHERIF BASSIOUNI, INTERNATIONAL EXTRADITION: UNITED STATES LAW AND PRACTICE 3 (5th ed. 2007) (hereinafter BASSIOUNI, INTERNATIONAL EXTRADITION). This makes extradition a "sovereign act," and treaties are not required in order to seek an extradition. *Id.* at 25. However, extradition by treaty is increasingly common today, *see id.* at 24-25, and the Treaty was the means by which Belgium extradited Trabelsi to the United States, *see* Min. Justice Dec. 1-13. Because extradition implicates "the sovereignty of a nation to control its borders and to enforce its treaties," *United States v. Riviere*, 924 F.2d 1289, 1300 (3d Cir. 1991), judicial review of such a decision could implicate concerns of international comity, *see Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992). But these implications do not mean that we lack jurisdiction to review an extradition decision. "A treaty . . . is a law of the land, as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined." *Rauscher*, 119 U.S. at 419. Because Article 5 of the Extradition Treaty provides "a rule of decision for the case before" us, *id.*, we have jurisdiction to ensure Trabelsi's extradition complied with that rule.

Neither *Casey* nor *Johnson v. Browne*, 205 U.S. 309 (1907), dictates otherwise. In *Casey*, we held that an individual could not challenge his extradition pursuant to a treaty in the United States prior to his extradition from the requested state. 980 F.2d at 1477-78. We reasoned that we could not review a preemptive extradition challenge without violating international comity or separation of powers. *Id.* *Casey* did not resolve whether an individual could challenge his extradition after arriving in the requesting state to face prosecution, the issue presented here. *See id.* at 1478.

In *Johnson*, a U.S. citizen named Charles Browne was convicted of fraud crimes and sentenced to two years' imprisonment. 205 U.S. at 310-11. Browne was released on bail but failed to appear for his sentence after losing his appeal. *Id.* at 311. Browne was later discovered in Canada, and the United States sought his extradition. *Id.* Canada refused, concluding the fraud crimes were outside the scope of the extradition treaty. *Id.* at 311-12. After the U.S. government obtained an indictment charging Browne with new crimes within the scope of the treaty, Canada extradited him based upon those charges. *Id.* at 312. When he arrived in the United States, Browne was imprisoned for his prior fraud convictions. *Id.* at 311. In other words, he was "extradited for one offense and . . . imprisoned for another, which the Canadian court held was not, within the treaty, an extraditable offense." *Id.* at 316. Although the extradition treaty did not contain a provision explicitly precluding this outcome, *id.* at 318, the Court previously interpreted the extradition treaty to incorporate the doctrine of specialty, which provides a "limitation of the right of the demanding country to try a person only for the crime for which he was extradited," *id.* at 317 (discussing *Rauscher*, 119 U.S. at 422-23). In light of this precedent, as well as federal statutes codifying the specialty principle, the Court held Browne's imprisonment unlawful. *Id.* at 317-22.

The Court reached its conclusion, in part, because "[w]hether the [fraud] crime came within the provision of the treaty was a matter for the decision of the [Canadian] authorities, and such decision was final by the express terms of the treaty itself." *Id.* at 316. Canada's decision was final because the United States agreed that Canada's decision would be final. Specifically, Article 2 of the Extradition Convention between the United Kingdom and the United

States provided that "[i]f any question shall arise as to whether a case comes within the provisions of this Article, the decision of the authorities of the government in whose jurisdiction the fugitive shall be at the time shall be final." Extradition Convention Between the United States of America and Her Britannic Majesty, July 12, 1889, U.K.-U.S., 26 Stat. 1508. Here, the Extradition Treaty contains no similar provision rendering Belgium's decision final.

This Court has understood *Johnson* not to mean that the court lacks jurisdiction to review challenges to extradition, but that a U.S. court "must give great deference to the determination of the foreign court in an extradition proceeding." *Casey*, 980 F.2d at 1477. This deference reflects the standard by which we review the extradition. *See United States v. Garavito-Garcia*, 827 F.3d 242, 247 (2d Cir. 2016) (giving deference to extraditing country's interpretation of its law); *cf. United States v. Anderson*, 472 F.3d 662, 666-67 (9th Cir. 2006) (holding that violation of an extradition treaty impacts personal jurisdiction over the defendant); *Riviere*, 924 F.2d at 1301-02 (finding that the double-jeopardy provision of a treaty was not violated where the extraditing country waived all objections to prosecution). Even those circuits that have construed *Johnson* broadly describe its holding in terms of the deference courts owe an extradition decision, not the court's jurisdiction to review such a decision. *See, e.g.*, *United States v. Van Cauwenberghe*, 827 F.2d 424, 428-429 (9th Cir. 1987) ("We therefore defer to the [extraditing nation] as to . . . extraditability under the Treaty and hold that Van Cauwenberghe was properly extradited."). This deference applies equally to claims challenging the double-jeopardy provisions of extradition treaties, *cf. Riviere*, 924 F.2d at 1301-02, and means that our review here is narrow.

12

The Second Circuit's approach in *Campbell*, 300 F.3d at 208-11, is instructive. There, the defendant, George Campbell, challenged his extradition from the Republic of Costa Rica, arguing that the firearms offenses for which he was extradited were not within the scope of the applicable extradition treaty. *Id.* at 208-09. According to Campbell, his extradition thus violated the principle of specialty, under which "an extradited defendant may not be tried for a crime not enumerated in the applicable extradition treaty." *Id.* at 209. The Second Circuit disagreed, explaining that "the question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine." *Id.* (citing *Johnson*, 205 U.S. at 316). As a result, the court "interpret[ed] *Johnson v. Browne* to mean that . . . courts cannot second-guess another country's grant of extradition to the United States." *Id.* (citations omitted). Given this deference, the court would "presume that if the extraditing country does not indicate that an offense specified in the request is excluded from the extradition grant, the extraditing country considers the offense to be a crime for which extradition is permissible." *Id.* Because Campbell's indictment included the firearms offenses, the court "infer[red] . . . that Costa Rica found the . . . offenses to be extraditable crimes" and refused to "second-guess that decision." *Id.* at 210.

Although *Campbell* dealt with a specialty claim, its approach is useful here. Trabelsi contends that his extradition violated Article 5 of the Treaty. The U.S. government's formal extradition request attached a copy of the indictment and, by affidavit, identified the elements of each offense. Just as the scope of the extradition treaty at issue in *Campbell* was for Costa Rica to determine, *see* 300 F.3d at 209, so too is the scope of Article 5 a matter for Belgium. It was for Belgium,

as the requested party, to determine whether to grant extradition, *see* Treaty, Art. 11, S. TREATY DOC. NO. 104-7, if Trabelsi "ha[d] [not] been found guilty, convicted, or acquitted in [Belgium] for the offense for which extradition [was] requested," Treaty, Art. 5., S. TREATY DOC. NO. 104-7. The Belgian Minister determined that Trabelsi's extradition would not violate the Treaty, and we will not "second-guess [Belgium's] grant of extradition." *Campbell*, 300 F.3d at 209.

This deferential approach means that "we will presume that if [Belgium] does not indicate that an offense specified in the request is excluded from the extradition grant, [Belgium] considers the offense to be a crime for which extradition is permissible." *Campbell*, 300 F.3d at 209. Applying the presumption makes our review straightforward. The extradition grant did not exclude any of the offenses included in the request for extradition. As a result, we presume that Belgium has determined that none of the offenses in the indictment violate Article 5 of the Treaty.

This presumption is not irrebuttable, however. Evidence that might rebut the presumption would include misconduct on the part of the United States in procuring an extradition, *see Casey*, 980 F.2d at 1475, or the absence of review of the extradition request by the requested party. Trabelsi, however, offers no such evidence. The United States sought Trabelsi's extradition. After comparing the offenses in the U.S. indictment with those of which Trabelsi was convicted in Belgium, Belgium granted the extradition request without limitation, and the Minister adequately explained his decision, including his basis for rejecting the overt-acts exclusion. Trabelsi's objections to extradition received multiple layers of review by Belgian courts and executive officials.

14

The presumption could also be rebutted by a showing that the requested state or party did not apply the correct legal standard adopted in the Treaty. Here, Trabelsi contends that Belgium applied the wrong legal standard to evaluate the protections afforded under Article 5 of the Treaty. He argues that the Treaty's use of "offenses" requires a comparison of the underlying conduct, submitting that we should follow the Second Circuit's approach in *Sindona v. Grant*, 619 F.2d 167, 178 (2d. Cir. 1980). But "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008). Article 5 of the Treaty provides that "[e]xtradition shall not be granted when the person sought has been found guilty, convicted, or acquitted in the Requested State for the offense for which extradition is requested." S. TREATY DOC. NO. 104-7. The use of the term "offense" in the Treaty compels us to reject Trabelsi's argument. The use of "offenses" is common in extradition treaties to which the United States is a party, *see Sindona*, 619 F.2d at 177, but its meaning is not always clear. "'[S]ame offenses' may range from 'identical charges' to 'related . . . but not included offenses.'" *Id.* (quoting M. CHERIF BASSIOUNI, INTERNATIONAL EXTRADITION AND WORLD PUBLIC ORDER 452-59 (1974)). Considering the range of possible meanings of "offenses," application of a *Blockburger* analysis, which would compare the elements of the offenses, 284 U.S. at 304, is not required and Trabelsi does not suggest that it is. Yet the Treaty's language does not compel Trabelsi's preferred interpretation either. As Trabelsi concedes, "some treaty double jeopardy provisions prohibit dual prosecutions based on the same acts," Appellant Br. at 25, but that was not the language used here. *Cf. United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1998); *see also* BASSIOUNI, INTERNATIONAL EXTRADITION, *supra* at 750 ("The use of the term 'same facts' creates a broader protection than 'same offense.'").

Trabelsi also points to language from Article 2 of the Treaty to suggest that conduct should be considered in comparing offenses. Specifically, he references Article 2, Paragraph 1, which provides that "[a]n offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." S. TREATY DOC. NO. 104-7. Trabelsi also highlights Article 2, Paragraph 4(b), which distinguishes between "essential" and non-"essential" elements, and notes that Article 2, Paragraph 4(c) instructs the Contracting States to "disregard that the respective laws do not place the offense within the same category of offenses or describe the offense by the same terminology." *Id.* According to Trabelsi, Article 2 shows that conduct should be considered in addition to elements. But nothing in Article 2 suggests that the Belgian Minister's decision is so unreasonable as to rebut the presumption that the extradition was a proper application of Article 5.

The legislative history surrounding the Extradition Treaty's ratification also supports interpreting the Treaty to apply to offenses, not conduct. The Senate Committee on Foreign Relations issued an Executive Report at the time the Treaty was ratified in 1996. In language that parallels Article 5 of the Treaty, the report notes that the Treaty "prohibits extradition if the person sought has been found guilty, convicted, or acquitted in the Requested State for the offense for which extradition is requested." S. EXEC. REP. No. 104-28 (July 30, 1996). The report further explains that "[t]his paragraph permits extradition . . . if the person sought is charged in each Contracting State *with different offenses arising out of the same basic transaction.*" *Id.* (emphasis added).

In accordance with both the plain text and legislative history of the Extradition Treaty, Trabelsi would need to show that Belgium failed to compare the offenses with which he was charged in the indictment to the offenses of which he was convicted in Belgium. Not only did the Belgian Court of Appeal individually compare and explain the differences between each U.S. count and the Belgian prosecution, the Belgian Minister of Justice's decision is to the same effect. The Minister of Justice interpreted the Extradition Treaty to apply to "offenses" rather than "acts" or "conduct." Considering other treaties with similar language, the Minister concluded that "it is not the facts, but . . . the offenses, that have to be identical" in order to deny an extradition request. Min. Justice Dec. at 10. The Minister explained that "[t]his concept excludes the (same) proof, the (same) evidence or the same material summary of facts that had been used, if applicable, for the purposes of proving the offenses for which the person had previously been prosecuted, sentenced, or acquitted." *Id.* at 11. As a result, the Minister determined that "the offenses for which [Trabelsi] was irrevocably sentenced . . . do not correspond to the offenses listed [in the indictment] that appear in the arrest warrant on which the U.S. extradition request is based." *Id.* Therefore, the Minister concluded that "the conditions and formalities for extradition [were] met," and granted the extradition request. *Id.* at 13.

For the reasons discussed, we defer to this decision of the Belgian courts and Minister of Justice that, based on an offense-based analysis, Trabelsi's extradition comports with Article 5 of the Treaty, since Trabelsi has offered nothing of merit to rebut the presumption. Because Trabelsi's challenges fail, we need not decide whether the charges in the U.S. indictment and the crimes for which Belgium convicted Trabelsi are identical under *Blockburger*.

Our concurring colleague departs from our reasoning based on the conclusion that Belgian courts should be not be accorded this measure of deference and that, instead, we should test the indictment under *Blockburger*. We cannot agree for three principal reasons.

First, both Trabelsi and our concurring colleague read terms into the Treaty that are not there. Ordinarily, *Blockburger* applies when a defendant raises a challenge under the Double Jeopardy Clause of the U.S. Constitution, but Trabelsi does not and cannot present such a challenge here. Rather, he seeks protection under an agreement between two sovereign nations, and our task is limited. *Cf. Sanchez-Llamas v. Oregon*, 548 U.S. 331, 343-47 (2006) (observing that where "a treaty does not provide a particular remedy, either expressly or implicitly," it is improper to read such a remedy into the treaty). As explained above, Article 5 of the Treaty prohibits extradition based on an "offense" for which the requested state has already prosecuted the defendant. S. TREATY DOC. NO. 104-7. Article 5 does not, however, mandate any particular legal standard for defining the same "offense," whether it is a conduct-based test (as Trabelsi proposes) or the *Blockburger* test (as our concurring colleague proposes). Indeed, courts should be especially reluctant to read conditions into a treaty that would render extradition more difficult, as Trabelsi and the concurrence would have us do. *See Factor v. Laubenheimer*, 290 U.S. 276, 298-99, 303 (1933) (instructing courts to liberally construe treaties in favor of extradition). Under the circumstances, grafting *Blockburger* onto the analysis would exceed "the limits on our judicial review of the issues determined by the [Belgian] courts." *Casey*, 980 F.2d at 1478.

Second, given the historical context of the Treaty, it is implausible that Article 5 mandates a *Blockburger* analysis. In 1987, when the Treaty was ratified, the law of double jeopardy under the U.S. Constitution was not settled. For example, Trabelsi urges us to adopt the "same conduct" test, which was articulated by the Second Circuit in 1980 to evaluate a *non bis in idem* challenge under our extradition treaty with Italy. *See Sindona*, 619 F.2d at 167. But the "foundation" for that test was not "eroded" until the Supreme Court's decision in *United States v. Dixon*, 509 U.S. 688 (1993) – six years after the Extradition Treaty with Belgium was ratified – which adopted *Blockburger* as the test to be used for all prior-prosecution double jeopardy challenges under the Fifth Amendment. *See Zhenli Ye Gon v. Holt*, 774 F.3d 207, 216 (4th Cir. 2014). It is highly doubtful that when striking the agreement in 1987, the United States and Belgium codified *Blockburger* as the *sole* method of testing whether an extradition request complied with Article 5 of the Treaty, when that test was not yet even the law of the land here. It requires yet another leap of logic to conclude that Belgium agreed that a test devised by U.S. courts would be the *sole* means to determine whether a Belgian offense and U.S. offense are the same. Such assumptions risk judicial amendment of the Treaty, in a manner which neither signatory has approved.

Our concurring colleague contends that by not reviewing Belgium's decision under *Blockburger*, we are "treat[ing] the Belgian proceedings as a black box." Concurring Op. at 1. This is hyperbole. We have examined the extensive Belgian proceedings, *supra*, at 4-5, and have confirmed that Belgium granted the U.S. extradition request employing an offense-based analysis, *supra*, at 16-17. The concurrence assumes we must review Belgium's decision under a test that a "party has credibly suggested." Concurring Op. at 1. This assumption is

mistaken because we are "not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

Third, our deferential approach protects each party's prerogatives under the Treaty. The United States' interests were identified in the extradition request, which was accompanied by a complete description of the applicable law of the United States, along with a breakdown of the elements of each offense, which Trabelsi did not, and does not, challenge. *See* Justice Dep't. Affidavit in Support of Request for Extradition (Mar. 12, 2008). Belgian authorities, in turn, were not left to guess at how to construe U.S. law. Rather, Belgium's courts and officials were able to compare the proffered description of U.S. law with their own construction of Belgian law. Indeed, after Trabelsi was extradited and raised the instant challenges, Belgian authorities confirmed by diplomatic note that "any similarity between the United States case and the Belgian case does not give rise to any bar to his being tried on the charges in th[e] indictment." Our concurring colleague essentially grants no deference whatsoever to the consistent and repeated conclusions of the Belgian authorities. The lack of deference is especially curious because, according to the concurrence, it is "an easy call" to defer to determinations made by authorities construing their own domestic law, Concurring Op. at 7. But that is precisely what Belgium did here. Belgium did not consider the merits of the Article 5 challenge solely with reference to U.S. law; it had to construe its own law as well. This is readily apparent in Belgium's analysis of Belgian Charge Q and U.S. Count 4.

For example, the Belgian Court of Appeal, when reviewing Trabelsi's conviction and sentence, construed Belgian law to provide that Trabelsi could be convicted of Charge Q simply for being "part of" an illegal private militia. Court of Appeal, Brussels, June 9, 2004, 59 (Belg.). On review of Trabelsi's challenge to the extradition request, the same Belgian Court of Appeal ruled that Belgian Charge Q and U.S. Count 4 were "not based on identical legal characterizations" because the U.S. offense requires "having *actually supplied resources to a foreign terrorist organization*,"[2] while "nothing similar [was required] in the Belgian proceeding." Court of Appeal, Brussels, Dec. 9, 2008, 8 (Belg.) (emphasis in original). Belgian authorities repeatedly construed Belgian criminal law, and stacked those constructions up against the proffered description of U.S. criminal law. These analyses showed that Belgium had a reasoned basis for concluding that Trabelsi could be extradited, and that conclusion – based in substantial measure on Belgium's construction of its own law – is entitled to considerable deference.

Even outside the context of specialty and dual criminality, U.S. courts will defer to the judgment of foreign courts construing their own laws. *See, e.g.*, *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 168-69 (3d Cir. 1997) (affirming an extradition after "defer[ring] to the judgment of the High Court of Justice for Trinidad and Tobago on the validity of the [operative] extradition treaty and its continuing vitality at the time of . . . extradition"). International comity remains important in this context. "It could hardly promote

---

[2] *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) ("[T]he statute [18 U.S.C. § 2339 B] does not penalize mere association with a foreign terrorist organization.").

harmony to request a grant of extradition and then, after extradition is granted, have the requesting nation take the stance that the extraditing nation was wrong to grant the request." *Campbell*, 300 F.3d at 209. Our deference here is customary, rather than "excessive" or "extraordinary," as our concurring colleague claims.

Such deference is appropriate, moreover, in view of the process that Belgium accorded to Trabelsi's extradition challenge. *Supra*, at 4-5. Our concurring colleague casts doubt on the Belgian proceedings because, purportedly, "Belgium has fulfilled its interest in this case." Concurring Op. at 4. But we have no reason to suppose that because Trabelsi served his Belgian sentence, Belgian authorities subjected the extradition request to lighter scrutiny than was warranted; the double-jeopardy principle itself is worth protecting. *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 476 cmt. c (AM LAW INST. 1987) ("The principle that a person should not be subject to double jeopardy is common to legal systems generally, and in many countries is constitutionally mandated."). The record contains nothing to support the concurrence's speculation.

Accordingly, we affirm the order denying Trabelsi's motion to dismiss the indictment and have no occasion to reach the question of whether dismissal would be an appropriate remedy.

*So ordered.*

PILLARD, J., concurring in part and concurring in the judgment:

I am in accord with much of Judge Wilkins' fine opinion. I agree that we have jurisdiction to review the Article 5 claim, and that the treaty codifies an offense-based rather than fact-based prior-prosecution test.

I cannot endorse the degree of deference that the majority accords Belgium's conclusion that the U.S. indictment did not charge Trabelsi with any of the same offenses for which he had already been prosecuted and punished. Under the banner of deference, the majority forgoes application of the only offense-based test any party has credibly suggested—the "same-elements" analysis associated with *Blockburger v. United States*, 284 U.S. 299 (1932). *See United States v. Dixon*, 509 U.S. 688, 696 (1993) (*Blockburger* "inquires whether each offense contains an element not contained in the other."). This deferential approach treats the Belgian proceedings as a black box, when a closer look underscores the appropriateness of the majority's acknowledged duty to assure that the requested state applied the "correct legal standard." Maj. Op. 14. (The majority also acknowledges that it would have cause to inquire further if confronted with a showing of "misconduct on the part of the United States in procuring an extradition" or "the absence of review of the extradition request" by the requested state. *Id.* at 13.)

Recognizing that we do not review the question *de novo* but accord deference to the due consideration and reasonable conclusions of the Belgian authorities, I would not employ quite so fully deferential an approach. It is our duty to look through the underlying proceedings to confirm that the correct legal standard—presumptively, *Blockburger*—was reasonably applied. We otherwise risk acceding even when a treaty partner, in all good faith, correctly states but misapplies a treaty's legal test and invites successive prosecution for the

same offenses in violation of a treaty's guarantee. Because my review of the record reveals no such error, but persuades me that Belgium made a reasoned decision that the proposed U.S. prosecution satisfies the offense-based test of Article 5, I, too, would affirm.

I.

My colleagues believe that maintaining comity with our treaty partner requires us to defer to Belgium's application of Article 5. I, too, defer to the Belgian decision, and explain below why I therefore vote to affirm. But, for at least five reasons, I disagree with the majority's resort to a form of deference that does not even confirm that the requisite analysis was reasonably performed.

First, we cannot unquestioningly accept Belgium's application of Article 5 because we have a constitutional obligation to interpret and apply treaties as the law of the land, and, as the majority acknowledges, the meaning of Article 5 is fully susceptible of judicial analysis. *Id.* at 9. It is our duty under the Supremacy Clause to apply treaty law just as we are bound to apply a federal statute or the Constitution itself. U.S. Const. Art. VI Cl. 2; *see United States v. Rauscher*, 119 U.S. 407, 430-31 (1886); Carlos Manuel Vázquez, *Treaties As Law of the Land: The Supremacy Clause and the Judicial Enforcement of Treaties*, 122 Harv. L. Rev. 599, 601-02 (2008).

Second, the majority's deferential approach inappropriately shifts the burden of persuasion by failing even to require a court to verify that the requisite legal analysis was reasonably performed by the foreign authorities. A defendant ordinarily need only "set out a prima facie case that the second indictment charges him with the same offense for which he has already been convicted," at which point "the

burden switches to the government to demonstrate, by a preponderance of the evidence, that the two indictments charged separate offenses." *United States v. Doyle*, 121 F.3d 1078, 1089 (7th Cir. 1997); *see also United States v. Jones*, 733 F.3d 574, 580 (5th Cir. 2013); *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 579-80 (E.D.N.Y. 1995) (Weinstein, J.) (remarking in the context of an extradition challenge that a treaty-based prior-prosecution bar "relates so closely to our double jeopardy concept that double jeopardy burdens of proof should apply"). The district court itself acknowledged uncertainty about whether U.S. Count IV and Belgian Charge Q actually allege distinct offenses, noting that "both underlying statutes criminalize providing support to banned organizations." J.A. 763. Such uncertainty—which the district court resolved by deferring to the Belgian authorities—should not have been treated as discharging the burden on the government and, ultimately, the court to identify a basis for allowing Charge IV to proceed.

Third, affording heightened deference to Belgium's application of Article 5 would be especially anomalous in this case, given our two nations' differing domestic law on prior-prosecution bars. To the extent that I can discern, the prior-prosecution bar in Belgium's national law appears to attach to facts and not to offenses, and it does not involve differentiation of elements. *See* T. Vander Beken, "Belgium, concurrent national and international criminal jurisdiction and the principle '*ne bis in idem*,'" *Revue Internationale de Droit Penal*, Vo. 73 (2002-2003), available at https://www.cairn.info/revue-internationale-de-droit-penal-2002-3-page-811.htm#pa3 ("As far as Belgian judgments are concerned, Belgium attaches the *ne bis in idem* effect to facts, not to offences."); *see generally* Bassiouni, INTERNATIONAL EXTRADITION LAW AND PRACTICE 751 (5th ed. 2007) ("The distinction between same offense and same facts … stems in

large part from the differences in the Common Law and Civilist Systems."). Despite that apparent difference in its domestic prior-prosecution law, Belgium agrees with the United States that this treaty codifies an offense-based approach. Nonetheless, it is unclear why we would give virtually final effect to the Belgian authorities' application of the agreed offense-based double jeopardy test that Belgium knows as a transplant, when that approach is deeply rooted here and familiar to our courts.

Fourth, Belgium has fulfilled its interest in this case. Trabelsi is a Tunisian, not a Belgian national. The Belgian government had a powerful interest in the apprehension and prosecution of an al Qaeda operative at work within its borders. Belgium accordingly tried, convicted, sentenced and imprisoned Trabelsi to the full extent of Belgian law, and retained him until he had served his sentence there to the satisfaction of the Belgian state. By the time Belgium responded to the U.S. extradition request, the Belgian sovereign interest was at its low ebb. Far from expecting uncommon deference, Belgian authorities most likely were inclined to *defer to the United States* in an effort to facilitate extradition, in which event deference to Belgium is rather circular.

Fifth, the majority's highly deferential approach is not supported by on-point or in-Circuit precedent. The majority correctly does not treat Belgium's sign-off on the extradition as conclusive of the Article 5 question. Our review to enforce individual rights under a treaty is compatible with the comity due to a sovereign treaty partner. *See generally Olympic Airways v. Husain*, 540 U.S. 644 (2004) (reviewing U.S. individuals' treaty claim against Greek state airline). The majority nonetheless concludes that it must presume the correctness of Belgium's decision. Yet the cases it cites for

deference are not about prior prosecution at all, but address specialty or dual-criminality treaty provisions. Those types of provisions protect requested states' domestic-law prerogatives, raising comity concerns not present here.

The doctrine of specialty provides that "extradited persons, once returned to the requesting country, may be tried only for those offenses for which extradition was granted by the requested country." *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 211 (4th Cir. 2014). The deference to extraditing countries' decisions in specialty cases flows from the nature and function of that doctrine to prevent a requesting country from transgressing limits the requested country places on its decree granting extradition. In *Johnson v. Browne*, 205 U.S. 309 (1907), for example, Canada granted the United States' request to extradite Browne, but the extradition decree excluded the charge of conspiracy to defraud the United States. When the United States prosecuted Browne on that excluded charge, the Supreme Court disapproved the bait-and-switch, emphasizing the importance of "the highest good faith" in construing a treaty between sovereigns. *Id*. at 321. Canada's decision, moreover, "was final by the express terms of the treaty itself" and thus was not to be second-guessed by the United States. *Id*. at 316. In *United States v. Campbell*, another specialty case, the Second Circuit relied on *Johnson* to hold that deference was owed to Costa Rica's determination whether charges specified in an extradition request were extraditable offenses. 300 F.3d 202, 209 (2d Cir. 2002). In view of Costa Rica's clear decision that the offense was among those it considered extraditable, the specialty doctrine provided no traction for Campbell's contentions to the contrary. *See also United States v. Riviere,* 924 F.2d 1289, 1301 (3d Cir. 1991); *United States v. Van Cauwenberghe*, 827 F.2d 424, 428 (9th Cir. 1987).

The very foundation of specialty is international comity; the same is not true of prior-prosecution bars. The specialty doctrine encourages international cooperation in the extradition system by giving assurance that, when a country gives up persons for extradition only for specified purposes or on certain conditions, those terms will not be flouted. *See Van Cauwenberghe*, 827 F.2d at 428. I cannot agree that the approach of the specialty cases "is useful here" in support of the majority's extraordinary deference in the very different context of a requested state's permissive rather than constraining application of a treaty's prior-prosecution bar. Maj. Op. at 12.

The majority invokes dual-criminality cases as well in support of its rule of deference. The doctrine of dual criminality "restricts the offenses for which a fugitive may be extradited to those that are criminal in both" the requesting and requested state. *Zhenli Ye Gon*, 774 F.3d at 211. A dual-criminality requirement effectively gives each country a veto based on whether its domestic law criminalizes the conduct at issue. In *Casey v. Department of State*, 980 F.2d 1472 (D.C. Cir. 1992), for example, Casey contended his extradition on U.S. RICO and narcotics charges would violate dual criminality because RICO-style racketeering is not a crime under Costa Rican law. We dismissed his case as unripe because he was still litigating in the Costa Rican courts and had not been extradited. Two members of the court noted in the dictum on which the majority here relies that, "at a minimum, *Johnson* means that an American court must give great deference to the determination of a foreign court in an extradition proceeding." *Id.* at 1477. Assuming we were to treat that dictum as persuasive, all it stands for is that in the dual-criminality context "a foreign court's holding as *to what that country's criminal law provides* should not lightly be

second-guessed by an American court—if it is ever reviewable." *Id.* (emphasis added).

Deference to a treaty partner's understanding of its own law for that purpose in that context makes sense for reasons quite similar to those that support deference in the specialty setting: Dual criminality is effectively a two-gate obstacle, with each country the keeper of its own gate; only when both are open can the extradition proceed. *See generally* Restatement (Third) of Foreign Relations Law § 476(1)(c). It is an easy call that the requested country is the authority on the content of its own domestic criminal law, holding the key to the gate it uniquely guards. *Cf. United States v. Garavito-Garcia*, 827 F.3d 242, 246-47 (2d Cir. 2016) (deferring to Colombian Attorney General's construction of Colombian criminal law). The reasons for deferring in dual-criminality cases to a requested country's determination of *what its own law requires* do not support deference regarding correct application of the terms of the bilateral treaty itself. *See generally Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232 (2014) ("For treaties, which are primarily compacts between independent nations, our duty is to ascertain the intent of the parties by looking to the document's text and context.") (citations, marks, and alterations omitted). The United States is as equipped as Belgium to understand Article 5. *Casey* and other dual-criminality cases cannot support a rule of deference to a treaty partner's application of the treaty's own prior-prosecution bar.

This case arises in a different posture and does not raise the same comity concerns as the specialty and dual criminality precedents the majority invokes. The question here is whether the proposed prosecution will expose Trabelsi to "being tried for the same offense in two different countries." *Zhenli Ye Gon*, 774 F.3d at 211. The majority's

cited specialty and dual-criminality cases involve deference to a requested state's decision to place *restrictions* on an extradition rather than, as here, to *authorize* (but not necessarily require) the requesting state to prosecute on all specified charges. If the United States decided to dismiss certain charges—based on prior-prosecution concerns or otherwise—it is hard to see how that would communicate any affront to Belgium. This case simply does not raise comity concerns such as would arise if the United States contravened limitations Belgium had imposed on its decision to extradite.

I thus cannot join the majority's reliance on what I view as an excessive degree of deference to the outcome of another country's legal process, by which the majority effectively sidesteps its acknowledged duty to confirm that Belgium made the requisite inquiry.

## II.

The record in this case confirms the value of a more searching review. For the most part, the Belgian reviewing bodies appear to have been of the view that, regardless of whether the American charges were legally distinct from the Belgian charges under a *Blockburger*-type analysis, the United States endeavored to prosecute Trabelsi for a factually broader terrorist conspiracy extending beyond the plot to bomb Kleine-Brogel for which he had already been convicted, and that the United States charged Trabelsi with providing material support to al Qaeda apart from the material support in Belgium for which he had already been successfully prosecuted. *See, e.g.*, J.A. 121-22, 544-46, 611-12. Thus, had the district court not performed an independent *Blockburger* analysis, there might have been some doubt whether a U.S. prosecution focused on Kleine-Brogel and events in Belgium

would have been authorized under the Belgians' own understanding of how the treaty applies.

Unlike the Belgian authorities, the district court focused on whether the two prosecutions involve legally distinct offense elements, rather than offenses comprised of the same legal elements but distinguishable by the elements' application to separate factual occurrences. The district court distinguished the three U.S. conspiracy charges on the ground that they require proof of agreement not required in the Belgian counts, whereas the Belgian prosecutions turned on proof of attempt or instigation that the U.S. charges do not require. *See generally United States v. Felix*, 503 U.S. 378, 389 (1992) (concluding that "a substantive crime and a conspiracy to commit that crime are not the 'same offense' for double jeopardy purposes"). Under that analysis, even a conspiracy prosecution focused on the same conduct at issue in the Belgian case would not be barred.

The district court did not actually complete an elements-based *Blockburger* analysis, however, with regard to Count IV (Providing Material Support and Resources to a Foreign Terrorist Organization), despite acknowledging that it presented "a closer question" than the other three counts because "both underlying statutes criminalize providing support to banned organizations." J.A. 763. To be sure, as the district court noted, Count IV requires proof that the organization to which the defendant provided material support is a U.S.-designated foreign terrorist organization, while Belgian Charge Q required proof that the defendant "created, assisted, or joined" an "organization of individuals whose purpose was to use force." *Id.* at 388. The district court did not, however, identify any element of Charge Q that is not also required by Count IV. *Id.* at 763 (only identifying the element in Count IV that was not in Charge Q). The court

also acknowledged that "[t]he universe of U.S.-designated foreign terrorist organizations may well be almost entirely subsumed by the universe of organizations formed for the purpose of using force." *Id.* Despite that, the district court found it appropriate to defer to the Belgian courts.

Consistent with the ordinary deference owed to the legal determinations of any treaty partner, U.S. courts must at the very least satisfy ourselves that relevant offenses were compared and found to be different under the treaty's legal standard. With respect to the first three counts of the U.S. indictment, that is and was easily done. Each is legally distinct from the Belgian charges under the elements-based analysis the district court recounted. And each is also factually distinct from those charges to the extent that, as the Belgian courts repeatedly underscored, the United States charged Trabelsi with criminal acts encompassing but much broader than the Belgium-specific crimes entailed by the plot against Kleine-Brogel, for which he had already been convicted and punished. *Blockburger* is satisfied on either ground: Like the fact-based *ne bis in idem* approach, *Blockburger* permits a subsequent prosecution under an indictment listing identical legal elements so long as it charges a different set of facts. That much is obvious. A charge of a bank robbery that took place in 2015 does not bar a subsequent charge of a different bank robbery in 2016. But *Blockburger* additionally authorizes subsequent prosecution arising from the same conduct or transaction (the 2015 bank robbery undergirding both prosecutions) where a purely fact-based approach would not, so long as the legal elements of the subsequent charge are sufficiently distinct. *See Felix*, 503 U.S. at 389.

The district court's opinion leads us up a bit of a blind alley, however, by confining itself to an elements-based

analysis and then failing to demonstrate how Count IV and Charge Q each requires an element not required by the other. The opinion thus makes the Belgian and American material-support counts appear to charge the same offense. Count IV (Providing Material Support and Resources to Foreign Terrorist Organization) seems materially identical to Charge Q ("contribut[ing] to or [being] part of a private militia or any other organizations of individuals whose purpose is to use force"). J.A. 149; *see also* J.A. 388 (somewhat different translation). Neither the courts nor executive officials, whether in Belgium or in the United States, did an analysis differentiating the elements of those two offenses. As I read the relevant statutes and the record explanations, Count IV is simply a narrower version of Belgian Charge Q. Any organization that qualifies as a foreign terrorist organization under U.S. law would also qualify as an "organization of individuals whose purpose is to use force" under Belgian law. *See* 8 U.S.C. §§ 1189(a)(1) (defining foreign terrorist organization); *id.* § 1182(a)(3)(B)(iii) (defining terrorist activity); 22 U.S.C. § 2656f(d)(2) (defining terrorism); J.A. 183 (Brussels Court of Appeals describing the prohibition on private militias as "[t]argeted in particular [at] organizations whose purpose is to use force, even if the use thereof is a means for achieving the organization's political objectives," and stating that "a potential organization of individuals that tries to spread radical Islam by using force would constitute an illegal private militia").

Even if Count IV and Charge Q charged the same legal elements, however, Count IV is not barred for the more basic reason that—as the Belgians reasonably explained—at least some version of Count IV rests on factually distinct acts of material support for terrorism that were not the basis of Trabelsi's Charge Q prosecution in Belgium. For instance, the United States alleges that, beginning in 2000, Trabelsi met

with conspirators in Europe and "ma[de] preparations to travel to Afghanistan to train for *jihad*." J.A. 33. Trabelsi eventually "carried cash and computers, which he had brought from Europe, to Afghanistan." *Id.* at 34. And, according to the U.S. indictment, Trabelsi received training and funding from al Qaeda in Afghanistan and Pakistan. *Id.* at 34-35. The Belgian authorities determined that, not only had Trabelsi not been prosecuted in Belgium for that conduct, it had not even been *known* to them at the time. *See id.* at 544. A material support prosecution resting on such evidence charges a distinct offense under Article 5.

* * *

The extraordinary deference the majority adopts is unnecessary to the resolution of this case. Because the United States seeks to prosecute Trabelsi for conspiracy rather than substantive offenses in Counts I, II and II, those U.S. charges are not barred by Article 5. To the extent that the United States proves in support of Count IV different acts of material support from those that supported the Belgian prosecution, that U.S. charge is also not barred.

For these reasons, I concur in part and concur in the judgment.