# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 9, 2021             Decided March 25, 2022

No. 20-3028

UNITED STATES OF AMERICA,
APPELLEE

v.

NIZAR TRABELSI, ALSO KNOWN AS NIZAR BEN ABDELAZIZ
TRABELSI, ALSO KNOWN AS ABU QA'QA,
APPELLANT

———

Consolidated with 21-3009

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:06-cr-00089-1)

———

*Celia Goetzl*, Assistant Federal Public Defender, argued the cause for appellant. On the briefs were *A.J. Kramer*, Federal Public Defender, and *Sandra Roland*, Assistant Federal Public Defender. *Tony Axam Jr.,* Assistant Federal Public Defender, entered an appearance.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman* and *Chrisellen R. Kolb*, Assistant U.S. Attorneys.

Before: WILKINS, RAO and JACKSON[*], *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Concurring opinion filed by *Circuit Judge* WILKINS.

Concurring opinion filed by *Circuit Judge* RAO.

WILKINS, *Circuit Judge*:   Belgium extradited Nizar Trabelsi, a Tunisian national, to stand trial in the United States on terrorism charges in 2013.  Eight years later, that trial has yet to take place.  This Court has adjudicated Trabelsi's claim once before, affirming the District Court's denial of his motion to dismiss the indictment.  *United States v. Trabelsi*, 845 F.3d 1181, 1184 (D.C. Cir. 2017).  Then, Trabelsi argued that his extradition violated the Extradition Treaty between the United States and Belgium because the U.S. indictment charged the same offenses for which he was convicted in Belgium.  Now, Trabelsi appeals the District Court's denial of his motions to reconsider dismissing the indictment in light of intervening, and conflicting, Belgian legal developments.

Trabelsi challenges the District Court's denial of his motions on three grounds.  First, he contends that the Belgian court decisions and official communications constitute significant evidence that merit reconsideration of his motion to dismiss.  He argues next that the District Court should have deferred to the Belgian courts' recent decisions interpreting his 2011 Extradition Order.  And finally, he asserts that the District Court should have compared the offenses in the U.S. indictment to the offenses for which he was convicted in Belgium.

---

[*] Circuit Judge Jackson was a member of the panel at the time the case was argued but did not participate in this opinion.

The Belgian legal developments Trabelsi invokes do not constitute significant new evidence that would warrant disturbing this Court's 2017 decision.  As a result, he has failed to meet the significantly high burden for departing from the law of the case.  We therefore affirm.

I.

We assume familiarity with the facts of this case, as recounted in our prior opinion, *Trabelsi*, 845 F.3d at 1184–85, and relate them only as relevant to the present appeal.  In 2001, Trabelsi was arrested, indicted, and convicted in Belgium for attempting to destroy the Kleine-Brogel military base.  While serving a ten-year sentence in Belgium, a grand jury in the United States indicted Trabelsi on charges of conspiracy to kill United States nationals outside of the United States; conspiracy and attempt to use weapons of mass destruction; conspiracy to provide material support and resources to a foreign terrorist organization; and providing material support and resources to a foreign terrorist organization.  On April 4, 2008, the United States issued an extradition request, pursuant to the Extradition Treaty between the U.S. and Belgium (the "Extradition Treaty" or "Treaty").

On November 19, 2008, the Court Chamber of the Court of First Instance of Nivelles issued an exequatur, or enforcement order, regarding Trabelsi's extradition, the first in a long line of Belgian court decisions.  Under Article 5 of the Treaty, an individual may not be extradited if he has been found guilty, convicted, or acquitted in the Requested State for the same offense, known as the *non bis in idem* ("not twice in the same") rule.  S. TREATY DOC. NO. 104-7 (1987).  The Court of First Instance found that the arrest warrant was enforceable, except as to Overt Acts 23, 24, 25, and 26 as referenced in the

indictment,[1] due to their overlap with the offenses Trabelsi was convicted of in Belgium. The Brussels Court of Appeal and the Belgian Court of Cassation, that country's court of last resort, both affirmed the Court of First Instance's decision.

The Belgian Minister of Justice, who represents the Belgian government in extradition proceedings, issued the Extradition Order ("Order") on November 23, 2011. In the Order, the Minister defined an overt act as "an element (of fact or factual), an act, a conduct or a transaction which in itself cannot automatically be qualified as an offense" and concluded that the United States would not violate Article 5 of the Treaty by relying on the same "overt acts" or factual elements in prosecuting distinct offenses from those charged in Belgium. J.A. 554 ("[T]he offenses for which the person to be extradited was irrevocably sentenced . . . do not correspond to the offenses . . . that appear in the arrest warrant on which the U.S. extradition request is based."). On review of the Minister's decision, the Belgian Council of State denied Trabelsi's request

---

[1] The Overt Acts are the following: "(23) In or about July 2001, in Uccle, Brussels, Belgium, Nizar Trabelsi rented an apartment; (24) In or about July and August 2001, in Belgium, Nizar Trabelsi bought quantities of chemicals, including acetone, sulfur, nitrate, and glycerine, to be used in manufacturing a 1,000-kilogram bomb; (25) In or about August 2001, in Belgium, Nizar Trabelsi traveled at night with conspirators to scout the Kleine-Brogel Air Force Base—a facility used by the United States and the United States Department of the Air Force, and at which United States nationals were present— as a target for a suicide bomb attack; (26) In or about early September 2001, in the vicinity of Brussels, Belgium, Nizar Trabelsi moved, and caused to be moved, a quantity of chemicals, including acetone and sulfur, from Trabelsi's apartment to a restaurant operated by a conspirator known to the Grand Jury, after police had visited the apartment for an apparently innocuous purpose." J.A. 423.

to stay the extradition and similarly concluded that the Overt Acts were merely constitutive elements of his indictment. Belgium extradited Trabelsi to the United States on October 3, 2013.

In the United States, Trabelsi moved to dismiss the indictment, arguing that his extradition violated the Treaty. In response, the Belgian Embassy in Washington, D.C. issued a diplomatic note ("First Diplomatic Note" or "Note"), explaining that the Order "is the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States" and "makes clear that Mr. Trabelsi may be tried on all of the charges set out in that indictment." J.A. 680. The Note stipulated that the prosecution was entitled to offer facts related to Overt Acts 23–26, per the Order. *Id.* The District Court agreed with the Minister of Justice over the judicial authorities, denying Trabelsi's motion because he had failed to demonstrate that he was prosecuted for the same offenses in Belgium and the United States. *United States v. Trabelsi*, No. 06-89, 2015 WL 13227797, at *1 (D.D.C. Nov. 4, 2015) ("*Trabelsi I*"). We affirmed the District Court's ruling on different grounds, *Trabelsi*, 845 F.3d at 1184. ("*Trabelsi II*"). We articulated a standard under which we "presume, absent evidence to the contrary, that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful" and found an offense-based analysis, rather than the *Blockburger* test, was the appropriate one to apply. *Id.* at 1184, 1186. Accordingly, we concluded that the Extradition Order's offense-based analysis reasonably construed the Treaty. *Id.* at 1190–92.

As his challenge to his extradition played out in the American courts, Trabelsi continued to pursue relief in Belgium. These Belgian legal proceedings—particularly four judicial decisions and various legal filings and other

communications—are what give rise to Trabelsi's current claims. First, the Court of First Instance rejected Trabelsi's requests both to halt the Belgian state from cooperating with the American authorities and to inform the American courts that the extradition proceedings violated Article 5 of the Treaty, due to their inclusion of the four Overt Acts. Trabelsi promptly appealed. On August 8, 2019, the Brussels Court of Appeal reversed, finding that the exequatur would not allow for the United States to prosecute Trabelsi for the four Overt Acts discussed and, as a practical matter, ordering the Belgian state to notify the U.S. authorities of its ruling. It stopped short of ordering Belgium to halt cooperation with the United States.

On November 13, 2019, the Belgian Embassy in Washington, D.C. issued another diplomatic note ("Second Diplomatic Note"), explaining that the Court of Appeal's August 2019 judgment was contrary to Belgium's Extradition Order and "therefore contrary to the clear wording of article 5 of the Treaty." J.A. 1405. The Second Diplomatic Note describes the Extradition Order as "the decision by the Belgian government that sets forth the terms of Mr. Trabelsi's extradition to the United States" and asserts "that any similarity between the United States case and the Belgian case does not give rise to any bar on his being tried on the charges in that [American] indictment." J.A. 1406. Further, the Note states that under the Treaty, "the Minister of Justice has sole authority to decide on a foreign extradition request since extradition is traditionally intergovernmental cooperation." *Id.*

Second, on February 26, 2020, the Court of First Instance ordered the Belgian state to notify the appropriate American authorities that Trabelsi could not be prosecuted for the four Overt Acts but denied his request to inform the American authorities that his prosecution violated the *non bis in idem* principle. The Belgian state appealed this judgment.

Nevertheless, on March 5, 2020, the Ministry of Justice complied with that court order, formally notifying the Department of Justice of the Court of First Instance's judgment.

Based on the August 8, 2019 Brussels Court of Appeal judgment, Trabelsi moved for the District Court to reconsider its motion to dismiss the indictment and compel compliance with his view of Article 5 of the Treaty, a view shared by Belgium's judicial authority. In March 2020, the District Court denied the motion. *United States v. Trabelsi*, No. 06-cr-89, 2020 WL 1236652, at *1 (Mar. 13, 2020) ("*Trabelsi III*"). The District Court found that the D.C. Circuit "was aware of the difference of opinions held by [the] Belgian Minister of Justice and Belgian judiciary." *Id.* at *12. Thus, "Trabelsi cannot reasonably maintain that the August 8, 2019 and February 26, 2020 decisions made available any new, and previously unavailable, line of argument." *Id.* The Court held that Trabelsi had offered no evidence to support reconsidering the Circuit's interpretation of the Extradition Order. *Id.* at *13. Trabelsi timely filed a notice of appeal on March 31, 2020.

Back in Belgium, the conflict between the Belgian executive and judicial authorities continued. The third of the intervening Belgian decisions came on May 28, 2020, when the Brussels Court of First Instance held that the Belgian state did not have authority to issue the Second Diplomatic Note. The Minister of Justice appealed that decision.

Fourth and finally, on July 15, 2020, the Brussels Court of Appeal affirmed the Court of First Instance's February 2020 judgment, denying Trabelsi's request to order the Belgian state to transmit a new diplomatic note to the United States expressing an opinion that the Extradition Order did not conform to Article 5. Significantly, the Court remarked:

> The aforementioned American decisions, and in particular that of the D.C. Circuit . . . make it clear that the American Courts are applying their own law and the law of international relations, that they have full knowledge of the dissensions between the Belgian Courts and the Belgian government, that they take into account the Belgian judicial decisions but that they consider that there is no reason, by virtue of their own law, over which this Court does not have the power to substitute its assessment, and the law of international relations . . . to give priority to these Belgian judicial decisions over the ministerial order on extradition, which these decisions do not modify or cancel and the effects of which they do not suspend.

J.A. 2021 (emphasis omitted). In the final Belgian litigation development included in the record before us, on July 31, 2020, the Belgian government filed a response to Trabelsi's new case seeking damages from the Belgian government for its failure to comply with the February 2020 decision.

Trabelsi continued his efforts in the United States. On November 3, 2020, he urged the District Court to reconsider its denial of his previous motion to reconsider, given the recent developments in his Belgian litigation, and to stay the district court proceedings pending his appeal in Belgium. Because the District Court no longer had jurisdiction over the matter, given the March 2020 notice of appeal, Trabelsi moved for an indicative ruling, pursuant to Federal Rule of Criminal Procedure 37(a). The District Court granted the stay but, in an appropriate exercise of discretion under Rule 37(a)(2), reached and denied Trabelsi's second motion to reconsider. *United States v. Trabelsi*, No. 06-cr-89, 2021 WL 430911, at *1 (Feb. 5, 2021) ("*Trabelsi IV*"). The Court once again held that the intervening Belgian decisions and pleadings did not qualify as

significant new evidence that would alter its understanding of the Extradition Order, as set forth in *Trabelsi I*, *II*, and *III*. *Id.* at \*15.

## II.

We review a denial of a motion to reconsider in a civil case for abuse of discretion, *Smalls v. United States*, 471 F.3d 186, 191 (D.C. Cir. 2006), and the same standard applies to a denial of a motion for reconsideration in a criminal case. *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014). However, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996) (citing *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990)). Thus, because the motion to reconsider turns on whether the District Court correctly interpreted the Extradition Treaty, and because we review the interpretation of treaties de novo, *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008), our review is effectively de novo. *See United States v. Fanfan*, 558 F.3d 105, 106–07 (1st Cir. 2009) (de novo review proper where defendant "charges the district court with misconstruing its legal authority" on motion for reconsideration).

Jurisdiction is secure over this interlocutory appeal, as it would be over a double jeopardy claim.[2] Under *Abney v. United States*, pretrial orders denying a motion to dismiss an

[2] The *non bis in idem* principle resembles double jeopardy but differs in that it "addresses the possibility of repeated prosecutions for the same conduct in different legal systems, whereas double jeopardy generally refers to repeated prosecutions for the same conduct in the same legal system." Gregory S. Gordon, *Toward an International Criminal Procedure: Due Process Aspirations and Limitations*, 45 COLUM. J. OF TRANSNAT'L L. 635, 687 (2007) (internal quotation marks and citation omitted).

indictment on double jeopardy grounds constitute "final decisions" for the purposes of 28 U.S.C. § 1291. 431 U.S. 651, 662 (1977) (internal quotation marks omitted). As discussed in *Trabelsi I*, however, *Abney* is not on all fours because Trabelsi's claim arises under the Treaty, not under the Double Jeopardy Clause of the Fifth Amendment. *Trabelsi II*, 845 F.3d at 1186. Still, *Abney*'s reasoning is instructive: Article 5's *non bis in idem* provision mirrors the Constitution's prohibition of double jeopardy and Trabelsi's claim remains collateral to his conviction. Accordingly, we may appropriately exercise jurisdiction over Trabelsi's appeal.

## A.

We must first address the threshold question of whether the law of the case doctrine determines the result in this subsequent appeal. The District Court and a prior appellate panel have already decided the question at the core of this case: whether Trabelsi's extradition violated Article 5 of the Treaty. The law of the case doctrine dictates that "[w]hen there are multiple appeals taken in the course of a single piece of litigation . . . decisions rendered on the first appeal should not be revisited on later trips to the appellate court." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995). Put differently, "the *same* issue presented a second time in the *same* case in the *same court* should lead to the *same result*." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc). Reopening an issue is possible, however, if "extraordinary circumstances" demand it. *Id.* That may include an intervening change in the law, a finding that the original decision was clearly erroneous, or if "significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light." *United States v. Bell*, 5 F.3d 64, 67 (4th Cir. 1993) (internal quotation marks and citation omitted); *see LaShawn A.*, 87 F.3d at 1393.

Trabelsi relies on the third exception to argue that the intervening Belgian court decisions, Belgian government communications, and legal filings constitute "significant new evidence" that warrant revisiting the propriety of his extradition under Article 5. This "new evidence" could not have been obtained earlier, given the timing of the Belgian litigation. We may therefore evaluate Trabelsi's claim to determine whether these developments qualify as significant new evidence, such that they require breaking from the law of the case.

## B.

Even before we reach the question of whether the Belgian legal developments constitute significant new evidence, we must examine whether the Belgian state's or its courts' interpretation of the Treaty controls. The Belgian courts have held that Trabelsi may not be prosecuted in the United States for Overt Acts 23–26 because they are the same as the offenses charged in Belgium. By contrast, the Belgian state has placed no limitations on his extradition or prosecution. Whether this Court owes deference to the Belgian courts may impact our ability to view the Belgian judgments as "significant new evidence."

At the outset, the Extradition Treaty governs these proceedings. *See Factor v. Laubenheimer*, 290 U.S. 276, 287 (1933). Like statutory interpretation, the interpretation of a treaty begins with the text itself. *See Medellin v. Texas*, 552 U.S. 491, 506 (2008). The Treaty does not vest final authority over its interpretation to either the Belgian state or the Belgian courts, but it does intimate whose interpretation controls. Throughout, the Treaty refers to the power of the "executive authority" in extradition proceedings. S. TREATY DOC. NO.

104-7.  It is the executive authority who can refuse to extradite an individual for offenses that are not illegal under ordinary criminal law and who can choose the state of extradition if there are competing requests. *Id.* at arts. 4(4), 13.  Significantly, it is also the executive authority who "consents to the person's detention, trial, or punishment" prior to the extradited person being detained, tried, or punished abroad.  *Id.* at art. 15(1).  Nowhere does the Treaty refer to the Belgian courts' role in extradition proceedings.  Its emphasis on the executive authority suggests the Belgian state has the final say over the Treaty's application in an extradition order.

Despite the Treaty's focus on the executive, it is true that American courts have urged deference to foreign courts' holdings in extradition proceedings.  In *Johnson v. Browne*, the Supreme Court held that whether a crime was an extraditable offense under the relevant treaty was a matter for the Canadian judicial authorities (the extraditing country) to decide.  205 U.S. 309, 316 (1907).  This Court later interpreted *Johnson* to mean that "an American court must give great deference to the determination of the foreign court in an extradition proceeding."  *Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992).  It further held that the foreign court's holding on "what that country's criminal law provides should not lightly be second-guessed by an American court." *Id.  But see Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018) (holding that a federal court should respectfully consider a foreign government's statements "but is not bound to accord conclusive effect to" them).

Yet, these cases did not concern a conflicting legal interpretation between a country's executive and its judicial authorities. And under the act of state doctrine, American courts are prohibited from questioning the validity of a foreign sovereign power's public acts committed within its own

territory. *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002). The doctrine applies if "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within" its territory. *Id.* (quoting *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp.*, 493 U.S. 400, 405 (1990) (alteration in original and internal quotation marks omitted)).

In the context of extradition proceedings, courts have refrained from finding extradition orders issued by the state executive invalid under the act of state doctrine. Take, for example, *United States v. Knowles*, in which the defendant challenged his extradition as unenforceable because the Supreme Court of the Bahamas had withdrawn its approval of the extradition until it deemed all legal processes in his case complete. 390 F. App'x 915, 917 (11th Cir. 2010) (per curiam). The court dismissed the relevance of the Bahamian court's order under the act of state doctrine because the Bahamian Ministry of Foreign Affairs had consented to the appellant's extradition. *Id.* at 928. It thus deferred to the executive authority over the judiciary's interpretation of the Extradition Order. *Id.*; *see also Reyes-Vasquez v. U.S. Att'y Gen.*, 304 F. App'x 33, 36 (3d Cir. 2008) (per curiam) (abstaining from declaring the President of the Dominican Republic's extradition decree invalid because it was an act of state). A court will thus "presume that if the extraditing country does not indicate that an offense specified in the request is excluded from the extradition grant, the extraditing country considers the offense to be a crime for which extradition is permissible." *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002).

This approach accords with the opinion of one of Trabelsi's experts, a Belgian professor of law, who explained

that "the final decision in terms of extradition is taken solely by the Government; this is a sovereign act, a political action taken by an administrative authority." Expert Op. at 2, D. Ct. Dkt. 345-4. It also aligns with the goal of maintaining cordial international relations and international comity in extradition proceedings. *Trabelsi II*, 845 F.3d at 1192–93. Even Trabelsi conceded in the briefing that the decision to extradite an individual is a political act controlled by the executive, not by the judiciary. Appellant Br. 8 ("the Minister of Justice makes the political decision whether to extradite pursuant to the exequatur"). Under the text of the Treaty and the act of state doctrine, this Court should defer to the Belgian state's Extradition Order and its explanations of it in subsequent diplomatic notes, rather than to the Belgian courts' interpretation.

## C.

Turning to the legal developments themselves, the Belgian court decisions, official state communications, and legal filings in the time since *Trabelsi II* do not constitute significant new evidence that would warrant deviating from the law of the case. Indeed, the disagreement between the Belgian state and its courts was plain at the time of *Trabelsi II* but did not impact our conclusion that Trabelsi's extradition comported with Article 5 of the Treaty.

First, the Brussels Court of Appeal's August 8, 2019 decision adds nothing new to the analysis and merely reiterates the Belgian court's view that the exequatur prohibits the prosecution of the four Overt Acts. To be sure, as Trabelsi notes, this decision is the first time a Belgian court heard his case since the issuance of the 2011 Extradition Order. But that does not bear on the Court of Appeal's analysis. Indeed, the Brussels Court of Appeal states that the Extradition Order

"could only validly grant the extradition requested by the United States within the limits of the exequatur . . . but not for the 'Overt Acts'" mentioned. J.A. 1320 (emphasis removed). But it does not assert that the Minister of Justice excluded those Acts nor that he was compelled to follow the exequatur.

Further, the Court of Appeal's decision supports this Court's assertion in *Trabelsi II* that the Minister of Justice abstained from excluding the four Overt Acts. Specifically, the Court remarked that the Belgian courts interpret Article 5 to imply a "review of the identity of the fact and not of its qualification" in determining whether an individual is being extradited for a previously charged offense. J.A. 1317 (emphasis removed). That review is what led the Court of First Instance to exclude the four Overt Acts from the exequatur. *Id.* But the Court of Appeal went on to remark that "[o]nly the ministerial extradition order of November 23, 2011 departs from this consistent interpretation of Article 5 of the Extradition Convention, arguing that the provision requires an identity of qualifications." J.A. 1319. Put differently, the Court of Appeal recognized the conflicting interpretation of Article 5 set forth by the Minister of Justice in the Extradition Order. The Minister of Justice's interpretation, in turn, is what this Court relied on in finding that Belgium did not place any limits on Trabelsi's extradition. The Belgian government confirmed that interpretation in its Second Diplomatic Note, sent on November 13, 2019, which characterized the August 2019 Court of Appeal judgment as contrary to its Extradition Order and reiterated that there was no bar on Trabelsi's extradition. At bottom, the decision does not reflect a change in the Belgian courts' or government's position from those originally considered in *Trabelsi II*.

Second, in its February 26, 2020, decision, the Court of First Instance simply confirmed the Court of Appeal's

judgment and ordered the Belgian government to send a copy of its decision to the appropriate U.S. authorities. On March 5, 2020, the Belgian Ministry of Justice sent a one-page letter to the Department of Justice, including the specific language the Belgian court requested, specifying that Trabelsi's extradition did not allow him to be prosecuted for facts set out in the four Overt Acts. Trabelsi latches on to the March 5 letter, arguing that it was an act of state because it expressed Belgium's official position that the Extradition Order precluded Trabelsi's prosecution as to the four Overt Acts. Appellant Br. 22, 40. That argument strains credulity. The letter does not purport to stake out Belgium's official position on the scope of Trabelsi's extradition. To the contrary, it opens with the stipulation that the Court of First Instance "has ordered the Belgian Government to formally notify its judgment, including the following wording" before including the relevant excerpt from the opinion. J.A. 1816. The letter's language explicitly states that the Ministry only transmitted the judgment because it was obligated to do so, not because it represented the Belgian state's position. As a result, the letter does not constitute an act of state, nor does it represent significant new evidence.

Third, as for the May 28, 2020, decision, the Court of First Instance admonished the Belgian government for sending the Second Diplomatic Note and challenging the court's ruling that Trabelsi's extradition was limited. But in the fourth relevant Belgian judicial decision, which Trabelsi avoids wrestling with in his briefs, the Brussels Court of Appeal on July 15, 2020 refused Trabelsi's request to order the Belgian state to send a new diplomatic note conforming its position to the Court's rulings. At the end of the day, the Court of Appeal acknowledged that we were aware that the Belgian courts and executive had conflicting views on how to interpret the Treaty, but the Court of Appeal impliedly conceded that it could not force the American courts to prioritize its interpretation. It

further conceded that the Belgian courts' decisions do not modify, cancel, or suspend the Extradition Order. Neither of these decisions support Trabelsi's proposition that the Belgian courts or government have altered their positions so drastically such that they qualify as new evidence sufficient to justify reconsideration of this Court's last opinion. If anything, the July 2020 decision forcefully supports that the Extradition Order controls.

As such, the two July 2020 pleadings filed by the Belgian state do not aid Trabelsi's claims. He argues that these pleadings diminish the significance of the Second Diplomatic Note, which, as described above, characterized the August 2019 Court of Appeal judgment as contrary to the Extradition Order and reiterated the Belgian state's view that there was no bar on Trabelsi's extradition. Trabelsi points to the language in the Ministry of Justice's July 15 pleading stating that the Second Diplomatic Note "was only intended to inform the U.S. judicial authorities that the [Belgian State] had filed an appeal," not to state its official position. J.A. 1968. In doing so, he takes this sentence out of context and ignores the one that follows, which stipulates that the diplomatic note "summarizes the position of the [Belgian State] . . . as well as its point of view regarding the concept of *non bis in idem*." *Id.* Further, Trabelsi seizes upon the Minister's language in the July 31 pleading that the March 2020 notification to the American authorities "does not mean that the [Belgian State] would have distanced itself once again from what was decided by" the February 2020 ruling. J.A. 2072 (internal quotation marks and emphasis omitted). Here, the Belgian government simply explained that it was ordered to transmit the March 2020 notice of the Court's order to the proper U.S. authorities. Remarking that it would not distance itself from the Belgian court's ruling is not the same as adopting the Belgian court's position on the Extradition Order as its own.

Trabelsi has selectively picked and chosen phrases from these documents to argue that this Court must defer to the Belgian courts' interpretation of Article 5 and revisit its decision in *Trabelsi II*. But none of the intervening decisions, communications, or pleadings present significant new evidence or detract from the deference this Court owes to the Belgian state. As a result, this Court will not depart from the law of the case and reopen the question of whether the indictment charges the same offenses as in the Belgian prosecution. The District Court's orders denying Trabelsi's motions to reconsider the motion to dismiss the indictment are affirmed.

*So ordered.*

WILKINS, *Circuit Judge*, concurring:   My concurring colleague raises the question of whether, in the previous appeal, *see United States v. Trabelsi*, 845 F.3d 1181 (D.C. Cir. 2017), we should have "first addressed the threshold question of whether the Treaty conferred a *non bis* right that Trabelsi could invoke in the United States after his extradition." Rao Concurring Op. at 1. I write separately only to note that the Government did not make my concurring colleague's argument in the prior appeal; instead, it contended that we lacked jurisdiction to review the extradition determination of Belgium.  Therefore, we did not reach, and the Government forfeited, any argument that the text of the Treaty does not confer upon Trabelsi any enforceable *non bis* rights.  *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356–57 (2006) (holding that even where a claim arises from an international treaty, "[t]he consequence of failing to raise a claim for adjudication at the proper time is generally forfeiture of that claim"); *Breard v. Greene*, 523 U.S. 371, 375–76 (1998) (failure to raise Vienna Convention claim in state court resulted in procedural default in subsequent habeas proceeding because procedural rules of the forum State govern).  I express no opinion on the merits of my colleague's interpretation of the Treaty's text.

RAO, *Circuit Judge*, concurring: Nizar Trabelsi has failed to show we should depart from the law of the case, and therefore I join the panel opinion in full. *See United States v. Trabelsi* ("*Trabelsi II*"), 845 F.3d 1181 (D.C. Cir. 2017). Since his extradition from Belgium in 2013, Trabelsi has challenged his U.S. indictment for terrorism crimes on the grounds of *non bis in idem*, the international law prohibition against being tried twice for the same offense. On its face, the U.S.-Belgian Extradition Treaty does not impose a *non bis* obligation on the United States after extradition has occurred. Nonetheless, in *Trabelsi II* the court simply determined Trabelsi was not being tried twice for the same offense. While the court reached the right result, in light of the important separation of powers considerations at stake, I would have first addressed the threshold question of whether the Treaty conferred a *non bis* right that Trabelsi could invoke in the United States after his extradition.

\* \* \*

Trabelsi has doggedly challenged his indictment for various crimes of terrorism on the grounds that it violates the maxim *non bis in idem* ("not twice in the same matter"). He claims the United States is prosecuting him for the same acts he was criminally punished for in Belgium. Trabelsi maintains that Article 5 of the U.S.-Belgian Extradition Treaty incorporates the *non bis* principle. *See* Extradition Treaty between the United States of America and the Kingdom of Belgium, art. 5, Apr. 27, 1987, S. TREATY DOC. NO. 104-7. *Non bis* is analogous to the Fifth Amendment's prohibition against double jeopardy. U.S. CONST. amend. V. It is blackletter law, however, that the Double Jeopardy Clause does not bar successive prosecutions by separate sovereigns. *See Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019); *Trabelsi II*, 845 F.3d at 1186. Trabelsi's argument that he may not be tried twice thus turns solely on the rights afforded by the Treaty.

Trabelsi's challenge to his U.S. indictment requires us to look first to the text of the Treaty to determine whether there is an enforceable right to bar a U.S. prosecution after extradition to the United States. *See Medellin v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."). On this threshold question, Trabelsi argues Article 5 of the Treaty incorporates the principle of *non bis* and therefore that if Belgium violated Article 5 when it extradited him, his U.S. indictment must be dismissed.

Article 5 states: "Extradition shall not be granted when the person sought has been found guilty, convicted or acquitted in the Requested State for the offense for which extradition is requested." Treaty, *supra*, art. 5(1). Article 5 concerns the effect of a first prosecution on a subsequent *extradition* and does not mention any successive "prosecution" or "trial" in the requesting country.[1] Rather, Article 5 places responsibility for implementing the *non bis* principle squarely on the extraditing

---

[1] By contrast, Article 15 provides: "A person extradited under this Treaty may not be *detained, tried, or punished* in the Requesting State" for offenses for which extradition was not granted. Treaty, *supra*, art. 15 (emphasis added). Article 15 deals with "specialty," which is "[t]he principle, included as a provision in most extradition treaties, under which a person who is extradited to a country to stand trial for certain criminal offenses may be tried only for those offenses and not for any other pre-extradition offenses." *Doctrine of Specialty*, BLACK'S LAW DICTIONARY (11th ed. 2019). Trabelsi's *non bis* claim cannot hinge on Article 15 because *Trabelsi II* specifically explained that Article 15 was not at issue in the appeal, 845 F.3d at 1185 n.1, and because this court has now twice held that Trabelsi's prosecution accords with both countries' understanding of the extradition order.

state (the "Requested State").[2] In other words, the Treaty required Belgium to refuse extradition if it had already prosecuted Trabelsi for the offenses underlying the U.S. indictment. But on its face, Article 5 says nothing about whether, *after* extradition has occurred, the United States may prosecute him for the same offense he was convicted of in Belgium.[3]

This litigation might have been resolved years ago if Article 5 of the Treaty had been given its plain meaning, which places no bar on a U.S. prosecution after extradition by Belgium. Instead, the district court skipped over the initial question of whether Article 5 provided a ground for Trabelsi to challenge his U.S. prosecution. That court assumed Article 5 could bar Trabelsi's U.S. prosecution because both parties were

---

[2] Extradition treaties typically frame the *non bis* principle as a constraint on the extraditing state and not on the requesting state. *See, e.g.*, Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, art. 5, Mar. 31, 2003, S. TREATY DOC. NO. 108-23; MICHAEL ABBELL, EXTRADITION TO AND FROM THE UNITED STATES § 6-2(18) (2007). As a practical matter, it makes sense to resolve issues regarding the scope of extradition before extradition occurs. On the other hand, the doctrine of specialty must usually be enforced in the requesting country to ensure that the prosecution is limited to those offenses for which extradition was granted.

[3] I do not address the separate question of whether, under the Treaty, a person in the United States could challenge extradition to Belgium on *non bis* grounds. Our courts often adjudicate treaty based *non bis* claims. *See, e.g., Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980) (Friendly, J.) (considering and rejecting a *non bis* defense to extradition from the United States based on a U.S.-Italian extradition treaty). Trabelsi, for instance, has brought numerous Article 5 claims against his extradition in Belgian courts.

"equal partners" under the Treaty. *United States v. Trabelsi*, 2015 WL 13227797, at \*4 (D.D.C. Nov. 4, 2015) (noting without analysis of the Treaty text that "the United States and Belgium may be on equal footing to consider a defendant's Article 5 claims"). The Treaty of course creates an agreement binding on both parties; however, each country's obligations are determined by the specific articles of the Treaty, not the mere fact of the Treaty.

*Trabelsi II* also did not address the question of whether Article 5 gave Trabelsi grounds for challenging his U.S. indictment and instead analyzed the substantive question of whether his extradition from Belgium was consistent with the Treaty. In answering that question, we properly explained that "the scope of Article 5 [is] a matter for Belgium" because "[i]t was for Belgium, as the requested party, to determine whether to grant extradition." 845 F.3d at 1188. We rejected Trabelsi's claims because Belgium had reasonably construed the Treaty to allow for his extradition for the crimes specified in the U.S. extradition request. In other words, we deferred to Belgium's conclusion that Trabelsi's extradition was not for the same offenses for which he was prosecuted in Belgium. Deference to Belgium's decision, however, does not address the prior question of whether Trabelsi could invoke Article 5 against his U.S. prosecution at all.

My point is simply that we should have analyzed the text of the Treaty first. A ruling based on the Treaty's text could have clarified that Article 5 would not provide a basis for Trabelsi to challenge his U.S. prosecution. This would have allowed the court to reject Trabelsi's motion to dismiss his indictment without passing on whether Belgium's extradition decision violated the Treaty.

\* \* \*

Furthermore, whether the Treaty confers an enforceable *non bis in idem* right should have been decided at the outset because Trabelsi's challenge to his U.S. prosecution implicates the Constitution's separation of powers.

First, courts must respect the commitment of the treaty making power to the President and the Senate. *See* U.S. CONST. art. II, § 2; *id.* art. VI (treaties are part of the supreme law of the land). Therefore, "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty." *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71 (1821) (Story, J.).

International law principles like *non bis* have no free-floating status in domestic law. *Cf. Medellin*, 552 U.S. at 504 ("[N]ot all international law obligations automatically constitute binding federal law enforceable in United States courts."); *Al-Bihani v. Obama*, 619 F.3d 1, 10 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc) ("[I]nternational-law norms are not domestic U.S. law in the absence of action by the political branches to codify those norms."). Instead, the text of a treaty determines whether a given provision or principle is a "directive to domestic courts" that may be enforced by litigants. *Medellin*, 552 U.S. at 508. Respect for the President's control over foreign affairs requires courts to take a text-first approach to treaty interpretation. *See id.* at 506; Majority Op. at 11.

Second, extradition is traditionally an executive act, and the Treaty's obligations will be implemented by the U.S. and Belgian executives. *See* Majority Op. at 12 (discussing the Treaty's "emphasis on the executive authority"). Assuming the

Treaty includes a right to enforce *non bis in idem* against a U.S. prosecution after extradition risks improper judicial interference with delicate foreign affairs, the conduct of which has been primarily committed to the President. U.S. CONST. art. II; *cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (noting that the "President has unique responsibility" for "foreign and military affairs").

In this case, Trabelsi was convicted in Belgium of conspiring and attempting to destroy U.S.-Belgian military facilities. The diplomatic negotiations between U.S. and Belgian law enforcement centered on the scope of the extradition and the crimes for which Trabelsi would be extradited. The negotiations also included other conditions, such as a guarantee that Trabelsi would not be sent back to Tunisia, his country of origin. Absent a firm legal basis, courts should not second guess such sensitive negotiations. The Executive Branch should be able to secure extradition against a clear background of treaty rights, interpreted fairly based on a treaty's text, not general principles of international law read into the treaty. Moreover, extradition links up with the Executive Branch's "clear and indisputable right to control the initiation and dismissal of prosecutions." *In re Flynn*, 973 F.3d 74, 94 (D.C. Cir. 2020) (en banc) (Rao, J., dissenting). Courts should not second guess an otherwise valid criminal indictment through the application of international law norms such as *non bis* unless a treaty clearly demands it.

Finally, as the government argued in earlier stages of this litigation, unless there is some other legal basis, treaty violations during the process of bringing Trabelsi to the United States cannot suffice to dismiss an indictment. Instead, the "broad rule" in the extradition context follows the longstanding *Ker-Frisbie* doctrine, under which alleged misconduct in bringing someone into the United States' criminal jurisdiction,

including even "shocking" "abductions," does not render the subsequent prosecution unlawful. *United States v. Alvarez-Machain*, 504 U.S. 655, 660–61, 669 (1992) (citing *Ker v. Illinois*, 119 U.S. 436 (1886); *Frisbie v. Collins*, 342 U.S. 519 (1952)); *see also United States v. Riviere*, 924 F.2d 1289, 1301 (3d Cir. 1991) ("*Ker* teaches that the mere existence of a treaty does not create individual rights" for everyone within a contracting country). The Supreme Court has consistently deferred to the Executive Branch to address the international implications of prosecuting someone already within U.S. jurisdiction. *Alvarez-Machain*, 504 U.S. at 669–70. In light of these background principles, unless a treaty (or other domestic law) specifically binds the U.S. government, courts cannot impose international law barriers to U.S. prosecutions.

\* \* \*

Before entertaining a treaty based challenge to a U.S. indictment, courts should ensure that the treaty protects an individual right against the U.S. government. This inquiry safeguards the separation of powers and mitigates the danger that loose treaty interpretation will undermine international cooperation in the enforcement of U.S. criminal laws. Although the court skipped this analysis in earlier stages of the litigation, *Trabelsi II* reached the right result and is law of the case barring Trabelsi's appeal. Examining the Treaty's text at the outset, however, might have prevented the nearly decade-long delay of Trabelsi's trial through successive and meritless efforts to undo his extradition on *non bis* grounds.